EAST FORD, INC., ET AL., [1] Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent East Ford v. Commissioner
Docket Nos. 101-92, 132-92, 133-92, 134-92.
United States Tax Court
T.C. Memo 1994-261; 1994 Tax Ct. Memo LEXIS 259; 67 T.C.M. (CCH) 3068; June 7, 1994, Filed *259 For petitioner in Docket No. 101-92: James T. Mallette and Terry R. Levy. For petitioners in Docket Nos. 132-92, 133-92, and 134-92: Harris H. Barnes III and John V. Eskrigge. For respondent: Robert W. West. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by statutory notices of deficiency, determined Federal income tax deficiencies for petitioners as follows: Petitioner
Yearend
Deficiency East Ford, Inc.
Dec. 31, 1986
$ 66,372
Thomas Truck Lease, Inc.
June 30, 1987
10,850
Ralph E. Thomas and Mary F. Thomas
Dec. 31, 1987
5,655
Dec. 31, 1984
[1] 23,730
Ralph E. Thomas, Jr. and Hope D. Thomas
Dec. 31, 1987
5,888
The deficiencies in this case stem from a classic dispute between a seller and a purchaser over the value of tangible and intangible assets transferred in the sale of an ongoing business. Subsequent to the sale at issue in this case, petitioners East Ford, Inc. (East Ford), and Thomas Truck Lease, Inc. (Thomas Truck), assigned conflicting values to the assets transferred, with each party attempting to *260 maximize its own tax benefits. Respondent issued notices of deficiency in an effort to resolve the inconsistent allocation of the purchase price. Although the parties could have avoided this dispute by agreeing at the time of the sale to a reasonable allocation of the purchase price, their failure to do so leaves it to this Court to assign reasonable values to the assets transferred. Specifically, we must determine whether any portion of the purchase price should be allocated to goodwill or to long-term rental leases transferred in the sale. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated by this reference. East Ford is a corporation organized under the laws of the State of Mississippi with its principal place of business in Jackson, Mississippi. Thomas Truck is a corporation organized under the laws of the State of Alabama with its principal place of business in Columbus, Mississippi. At the time of filing their petition in this case, petitioners Ralph E. Thomas and Mary F. Thomas resided in Columbus, Mississippi. At the time of filing their petition in this case, petitioners Ralph E. Thomas, Jr., *261 and Hope D. Thomas were Mississippi residents with a mailing address in Columbus, Mississippi. East Ford operates a Ford dealership engaged in sales and service of automobiles in Jackson, Mississippi. Action Leasing and Rental, Inc. (Action), was a corporation engaged in the business of leasing trucks and trailers in the State of Mississippi. On September 25, 1985, Action was merged into East Ford and thereafter was operated by East Ford as a separate truck-leasing business in Jackson, Mississippi. Less than 1 year after the merger, East Ford decided to sell Action's truck-leasing and rental business in order to be able to concentrate solely on the automobile and small truck sales business. Albert East (Mr. East), East Ford's owner, contacted Ralph Thomas (Mr. Thomas) to see if Mr. Thomas' company, Thomas Truck, would be interested in purchasing Action. Prior to October 14, 1986, Thomas Truck operated a truck dealership engaged in selling and servicing new and used trucks in Columbus, Mississippi. Thomas Truck desired to expand its operations from North Mississippi into the Jackson and Central Mississippi areas. The proposed purchase of Action provided Thomas Truck with an *262 opportunity to expand its operations into the Jackson, Mississippi, area through the acquisition of an existing business. The proposed purchase of Action also gave Thomas Truck the opportunity to try the truck-rental business, a new endeavor for Thomas Truck. Mr. East offered to sell Action to Mr. Thomas for approximately $ 1,600,000. Mr. East set the initial offering price at this amount to provide sufficient proceeds to allow East Ford to satisfy obligations and liens totaling $ 1,404,771.19 on Action's trucks. In reviewing Mr. East's offer, Mr. Thomas consulted with Hugh Hubbard (Mr. Hubbard), Thomas Truck's general manager, regarding the value of Action's trucks. Mr. Thomas indicated to Mr. Hubbard that Thomas Truck would have to pay an amount somewhere between wholesale and retail value "in order to make this deal work." Mr. Thomas proceeded to assign individual values to each of Action's trucks. In conducting this valuation, Mr. Thomas consulted with Mr. Hubbard, Don Sheldon (Thomas Truck's operations manager), and Ed Thomas (Mr. Thomas' son and part owner of Thomas Truck); however, Mr. Thomas provided the final determination of each truck's estimated value. Based on *263 his valuation of the trucks, Mr. Thomas made a counteroffer to Mr. East to purchase Action's truck-leasing business for $ 1,330,000. Mr. East, acting on behalf of East Ford, accepted Mr. Thomas' counteroffer, and the parties executed a sales agreement on October 14, 1986. The obligations and liens on the trucks were satisfied in full at the closing of the sale from the proceeds of the sale and by East Ford's paying $ 74,771.19 to the banks. Thomas Truck borrowed the entire purchase price from Unisouth Banking Corp. (Unisouth) and pledged as security therefor all of the rolling stock and equipment purchased in the transaction. The loan documentation describes the financing as a purchase money loan secured only by the equipment transferred to Thomas Truck. No leases served as security for the loan, and no personal guarantees were given by Mr. Thomas or any of Thomas Truck's owners. The tangible assets sold included 65 heavy, medium, and small trucks and trailers. Of the assets transferred, 19 were heavy trucks subject to existing long-term maintenance leases, 12 were heavy trucks subject to long-term finance leases, 27 were either heavy, medium, or small trucks under no lease, *264 and 7 were highway truck trailers. Many of the trucks without long-term leases were utilized by Action in its short-term/daily rental business. None of the trucks were reconditioned for resale but were purchased by Thomas Truck on an "as is" basis. East Ford gave no warranties on the trucks and trailers other than that they "be in serviceable condition, free of any major defects costing more than $ 500.00 to correct." The terms of the sales agreement state that East Ford sold to Thomas Truck "the customer lists, good will and all of the right, title and interest of the Seller in and to the equipment as shown on Exhibit "A" and the leases pertaining thereto" [2] for the total consideration of $ 1,330,000. The sales agreement also states that "In order to protect the purchase of the property, business and goodwill thereof" East Ford will refrain from engaging in the leasing of trucks and tractors in the State of Mississippi for a period of 5 years. The shareholders of East Ford, Mr. East and his son, Bert East, also signed a covenant not to compete, whereby they personally agreed, in exchange for $ 20,000, and "in order to protect the purchase of the property and the business of *265 said Thomas Truck Lease, Inc. and the goodwill thereof," not to engage in the leasing or renting of trucks in the State of Mississippi for 5 years. The sales agreement did not contain an allocation of the purchase price to any of the assets transferred. East Ford and Thomas Truck subsequently filed timely income tax returns but reported conflicting allocations of the purchase price between the tangible and intangible assets. Of the $ 1,330,000 purchase price, East Ford allocated $ 984,500 to the trucks sold and reported a capital gain on its 1986 income tax return of $ 345,500 attributable to the sale of goodwill. Thomas Truck allocated the entire purchase price to the trucks and trailers and none to the purchase of goodwill. On its corporation income tax return for the year ended June 30, 1987, Thomas Truck claimed depreciation expense deductions *266 on the trucks and trailers purchased from East Ford using a tax basis of $ 1,330,000. On October 4, 1991, respondent issued statutory notices of deficiency to each of petitioners in this case in an effort to resolve their inconsistent allocation of the purchase price between the assets sold. Subsequent to the sale, Thomas Truck utilized Action's rental location for approximately 2 months until the leasing business was moved to another location in the suburbs of Jackson, Mississippi. Most of Action's employees were not retained after the relocation. Twenty-seven of the 65 trucks purchased from East Ford were resold by Thomas Truck within 12 months of the purchase of Action for total proceeds of approximately $ 298,687. While the total sales proceeds from the resold trucks were approximately $ 106,727 less than the value assigned to the trucks by Thomas Truck, this "paper loss" does not take into consideration any reduction in the value of the trucks while they were held by Thomas Truck or the fact that 16 of the trucks were resold at internally negotiated prices to a Thomas Truck affiliated dealer and that others were resold at preset prices pursuant to buy out terms in their *267 finance leases. Additional resales were made in later years, with Thomas Truck retaining very few of the East Ford trucks less than 5 years after purchasing Action's truck-leasing business. OPINION Thomas Truck's purchase of Action's truck-leasing business constitutes an "applicable asset acquisition" within the purview of section 1060.[3] *268 Section 1060(c) defines an applicable asset acquisition as "any transfer (whether directly or indirectly) -- (1) of assets which constitute a trade or business, and (2) with respect to which the transferee's basis in such assets is determined wholly by reference to the consideration paid for such assets." In order to determine the amount realized from, and the basis in, each of the transferred assets in an applicable asset acquisition, section 1060 mandates the use of the residual method of purchase price allocation set forth in section 338(b)(5) and the accompanying regulations. The temporary regulations under section 1060 provide the same residual allocation method. [4]
Generally, the residual method requires that consideration be allocated to four classes of assets in descending order of priority. Sec. 1.1060-1T(d), Temporary Income Tax Regs., 53 Fed. Reg. 27040 (July 18, 1988). Class I assets consist of cash, demand deposits, and like accounts in banks, savings and loan associations, and other depository institutions. Sec. 1.1060-1T(d)(1), Temporary Income Tax Regs., supra. Class II assets consist of certificates of deposit, U.S. Government securities, and readily marketable stock or securities. Sec. 1.1060-1T(d)(2)(i), Temporary Income Tax Regs., supra. Class II assets consist of all assets, other than class I, II, or IV assets, both tangible and intangible, including furniture and fixtures, *269 land, buildings, equipment, accounts receivable, and covenants not to compete. Sec. 1.1060-1T(d)(2)(ii), Temporary Income Tax Regs., supra. Consideration paid for these assets must be allocated in proportion to the fair market values of such assets on the purchase date to the extent of the fair market values of such assets. Sec. 1.1060-1T(d)(2), Temporary Income Tax Regs., supra. Class IV assets consist of intangible assets in the nature of goodwill and going concern value. Sec. 1.1060-1T(d)(2)(iii), Temporary Income Tax Regs., supra. All remaining consideration, or residual consideration, must be allocated to class IV assets. In the sale of assets by East Ford to Thomas Truck, there were no class I or class II assets transferred; therefore, the entire purchase price must be allocated between class III and class IV assets. The $ 20,000 paid by Thomas Truck for the covenant not to compete is allocated under the regulations, and as agreed by the parties, as a class III asset. The remaining $ 1,330,000 paid by Thomas Truck for Action's truck-leasing business must be allocated to the class III assets transferred to the extent of their fair market values, with any *270 excess thereafter applying to goodwill as a class IV asset. Since petitioners were unable to agree on a reasonable value for the trucks and long-term leases, the Court has been placed in the position of determining the fair market value of those assets at the time of the sale. Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. Fair market value is a question of fact and is determined by examining the entire record. Skripak v. Commissioner, 84 T.C. 285, 320 (1985). The best evidence in the record of the fair market value of the trucks transferred in this case is contained in the fourth quarter 1986 edition of the "Truck Blue Book" (Blue Book), a nationally recognized used truck valuation guide. The Blue Book provides a comprehensive listing of used trucks by make, model, and year, along with each truck's estimated retail and finance (wholesale) value. Optional components (add-ons), such as larger engines, air-conditioning, etc., *271 are listed separately, along with the amount each component adds to the estimated value of the base model truck. Finally, the Blue Book provides for a regional conversion in valuing used trucks -- for Mississippi, the adjustment is an 8 percent increase over the stated Blue Book value. We think the Blue Book provides sufficient information to assign a reasonable value to the trucks sold in the instant case. Unfortunately, East Ford and Thomas Truck, while agreeing on the widely accepted use of the Blue Book for estimating used truck values, were unable to agree on the extent of their reliance on the Blue Book in assigning values to the trucks sold in this case; as a result, petitioners made the valuation issue much more complicated than it needed to be. We find petitioner Thomas Truck's valuation of the trucks to be more in line with the Blue Book's valuation process, and, thus, substantially more reliable than the valuation provided by East Ford. In attempting to support their respective valuations of Action's trucks, East Ford and Thomas Truck both performed a truck by truck analysis, beginning with each truck's Blue Book finance (wholesale) value. Although Blue Book retail *272 values represent the estimated market values of individually sold trucks, petitioners agreed that the Blue Book finance values, which are typically 25 percent lower than retail values, should be used to value a bulk purchase of used trucks. Thomas Truck next increased each truck's finance value by the value of any add-ons and made the 8 percent regional adjustment listed in the Blue Book for trucks sold in Mississippi. East Ford made no adjustments for add-ons, apparently believing, as Mr. East stated at trial, that add-ons such as larger engines "wouldn't affect the value all that much." East Ford was also either not aware of, or chose to ignore, the 8 percent regional adjustment. We agree with Thomas Truck's methodology that the Blue Book value plus add-ons should be considered in valuing the trucks purchased from East Ford and that a regional adjustment should be made. The only adjustment made by East Ford to the finance value of the trucks was to reduce the value of certain trucks for high mileage, poor condition, or frequent maintenance problems. The total adjustment made by East Ford was a reduction in value of $ 29,422. Thomas Truck agreed that a truck's value would be *273 reduced for above average wear and tear on the vehicle; however, Thomas Truck made no attempt to dispute the adjustment East Ford made for these factors. We agree that a reasonably prudent buyer with knowledge of a truck's excessive mileage, poor condition, or maintenance difficulties would offer a lower price for the truck. Thus, the only evidence in the record of the wear and tear on Action's trucks at the time of the sale -- the adjustment made by East Ford -- should be considered in determining the reasonable value of the trucks. Pursuant to the above, and on the basis of the entire record, we conclude that a reasonable value for Action's trucks at the time they were sold to Thomas Truck is $ 1,280,000. Our valuation analysis is supported by the fact that Thomas Truck was able to borrow the full amount paid for Action using a purchase money loan secured only by the equipment transferred. We find it unnecessary to adjust the value of the trucks based on the subsequent sales made by Thomas Truck since many of the trucks were resold at internally negotiated prices to a Thomas Truck affiliated dealer or at preset prices pursuant to buyout terms in finance leases executed by East *274 Ford prior to selling Action. [5] Additionally, the resale proceeds represent a paper loss that does not take into consideration any reduction in value of the trucks while they were held by Thomas Truck. A subsequent sales price is only evidence of value to the extent it is an arm's-length sale and also to the extent that external factors have not changed the value of the item. Parks v. Commissioner, T.C. Memo. 1994-1; Estate of Bettencourt v. Commissioner, T.C. Memo. 1987-313. We think that the value we have assigned to the trucks, substantially relying on the fourth quarter 1986 edition of the Blue Book, is a reasonable determination of the trucks' value on the date of sale. *275 East Ford also argues that a portion of the purchase price paid by Thomas Truck should be allocated to the long-term leases to which some of Action's trucks were bound at the time of the sale, even though no such allocation was made in the sales agreement. East Ford relies on two memorandum opinions of this Court: Pack v. Commissioner, T.C. Memo. 1980-65; Grow v. Commissioner, T.C. Memo. 1984-64. We find these cases distinguishable from the present case. In Grow v. Commissioner, supra, the taxpayers met a strong burden of proving that rental contracts transferred pursuant to the sale of a business "had independent economic significance such that we might conclude that they were a separately bargained-for element." In Pack v. Commissioner, supra, we held that the taxpayer "introduced sufficient evidence to permit us to reach a fair determination" of the value to be allocated to assets transferred in the sale of a business. In contrast, in the instant case, petitioners failed to present any evidence of the value of the leases and failed to establish that *276 the leases were a separately bargained-for element of the sale. Therefore, we conclude that no allocation of the purchase price should be made to the leases. Pursuant to the residual allocation method, the excess purchase price over the portion allocated to the class III assets (the $ 1,280,000 allocated to the trucks and trailers) should be allocated to goodwill as a class IV asset. In this case, the residual allocation to goodwill is $ 50,000. We think this allocation is a reasonable indication of the amount Thomas Truck was willing to pay -- over and above the value of the trucks -- for the opportunity to try the truck-leasing business purchased from Action. [6]
*277 Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners were consolidated for purposes of trial, briefing, and opinion: Ralph E. Thomas and Mary F. Thomas, docket No. 132-92; Ralph E. Thomas, Jr., and Hope D. Thomas, docket No. 133-92; and Thomas Truck Lease, Inc., docket No. 134-92.↩
1. The deficiency for taxable year 1984 results from an adjustment to a 1987 operating loss carryback allowance. ↩
2. Exhibit A is an attachment to the sales agreement containing identifying information (make, model, year, etc.) ofthe 65 trucks and trailers transferred to Thomas Truck.↩
3. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Although the temporary regulations under sec. 1060 were promulgated on July 18, 1988, they are effective with respect to any acquisition of assets occurring after May 6, 1986, and, thus, are applicable in this case. Sec. 1.1060-1T(a)(2), Temporary Income Tax Regs., 53 Fed. Reg. 27039↩ (July 18, 1988).
5. Twelve of Action's trucks were subject to finance leases at the time the company was sold to Thomas Truck. It is unclear from the record how many of these trucks were resold by Thomas Truck pursuant to buyout terms in the preexisting leases. We note that the parties did not introduce evidence of the value of the buyout provisions nor does it appear that they considered the buyout provisions in determining the price paid for Action's trucks. Accordingly, we find that the buyout provisions in the existing leases had little effect on the value of Action's trucks at the time they were purchased by Thomas Truck.↩
6. East Ford's allocation of $ 345,500 to goodwill results in a tax savings to the company of $ 63,061 due to the reduced capital gains rates applicable to the sale of goodwill. It is interesting and possibly coincidental that the tax savings represented by East Ford's goodwill allocation approximates the out-of-pocket shortfall incurred to pay off the existing debt on the trucks.↩