108 T.C. No. 15


UNITED STATES TAX COURT


NORWEST CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20567-93, 26213-93.        Filed April 28, 1997.


**I.**

Norwest Bank Nebraska, N.A., a subsidiary of petitioner, removed asbestos-containing materials from its Douglas Street building in connection with the building's renovation and remodeling.  On its 1989 return, petitioner claimed a $902,206 ordinary and necessary business deduction with respect to the asbestos-removal expenditures.  In the notice of deficiency, respondent disallowed the deduction.

<u>Held</u>: The costs of removing the asbestos-containing materials must be capitalized because they were part of a general plan of rehabilitation and renovation that improved the Douglas Street building.

**II.**

Petitioner's subsidiary Norwest Bank Minneapolis (NBM) owned "blocked deposits" at the Central Bank of Brazil (Central Bank) consisting of principal repayments of dollar-denominated loans previously made to Brazil in the ordinary course of NBM's banking business. The

Central Bank prevented petitioner from repatriating these deposits because Brazil had insufficient hard currency (U.S. dollars) to make payments on the loans. In order to reduce petitioner's blocked deposit holdings and decrease its foreign debt exposure, petitioner entered into a debt-equity conversion transaction in 1987 as follows: $12,577,136 of petitioner's blocked deposits was exchanged for a 14.361-percent interest in a Brazilian company. Petitioner agreed to maintain the invested funds in Brazil for 12 years.

On its consolidated 1987 return, P claimed a $4,577,136 loss with regard to the debt-equity conversion transaction. In the notice of deficiency, respondent disallowed petitioner's claimed loss on the grounds that petitioner did not establish that any deductible loss was sustained in 1987.

1. Held: The step transaction doctrine is not applicable. The Central Bank converted the full face value of petitioner's blocked deposits, plus accrued interest, at the official exchange rate without diminution or discount into cruzados, which were used to pay a third party in exchange for its 14.361-percent interest in the Brazilian company. The exchange of the blocked deposits for the cruzados and the conversion of the cruzados into stock was not a transitory step but rather a substantive and significant element of the conversion. Petitioner's loss, if any, is measured by the difference between its basis in the blocked deposits and the fair market value of the cruzados it received. G.M. Trading Corp. v. Commissioner, 103 T.C. 59 (1994), supplemented by 106 T.C. 257 (1996), on appeal (5th Cir., Oct. 4, 1996), followed. Petitioner did not realize a loss because the basis of the blocked deposits and the fair market value of the cruzados were identical on the date of the transaction.

2. Held, further: The 12-year repatriation restriction imposed on petitioner's invested funds warrants a 15-percent discount on the fair market value of the cruzados P received, rendering a $1,886,570 loss for petitioner's 1987 tax year.

## III.

In 1989, Norwest Financial Resources, one of petitioner's affiliates, acquired the lease portfolio and other assets of Financial Investment Associates, Inc., for $141,456,620. On its 1989 return, petitioner allocated $131,513,038 of the $141,456,620 purchase price to the lease portfolio. The purchase agreement provided

that no part of the purchase price is attributable to goodwill. In the notice of deficiency, respondent determined that petitioner overstated the fair market value of the lease portfolio by $1,328,618, which amount should be allocated to goodwill, going-concern value, or other nonamortizable intangible assets.

The parties presented experts who valued petitioner's lease portfolio. The difference between the experts' valuations centers around the different discount rates they used (respondent's expert used a 15.6-percent discount rate, while petitioner's expert used an 11.5-percent discount rate).

<u>Held</u>:  Giving consideration to all the evidence presented, 13 percent is determined to be the appropriate discount rate.

<u>Mark Alan Hager</u>, <u>Joseph Robert Goeke</u>, <u>Thomas C. Durham</u>, <u>David Farrington Abbott</u>, <u>William Albert Schmalzl</u>, <u>Glenn A. Graff</u>, <u>Daniel A. Dumezich</u>, and <u>Scott Gerald Husaby</u>, for petitioner.

<u>Lawrence C. Letkewicz</u>, <u>Dana Hundrieser</u>, and <u>Gary J. Merken</u>, for respondent.

CONTENTS

                                                              Page

General Findings ........................................ 6

Issue I.    Removal of Asbestos-Containing Materials ..... 6
            A. The Douglas Street Building .............. 7
            B. Remodeling Plans ........................ 7
            C. Use of Asbestos-Containing Materials in
               the Douglas Street Building .............. 8
            D. Federal Asbestos Guidelines .............. 8
            E. Testing at the Douglas Street Building and
               Decision To Remove Asbestos-Containing
               Materials ................................ 10
            F. Contractors and Work Performed ........... 13
            G. Health Concerns ......................... 15

H. Liability Issues .......................... 16
I. Tax and Accounting Matters ................ 17
J. Petitioner's Returns and Petitions ........ 18
K. Notice of Deficiency ..................... 19
Discussion.................................... 19
L. Capital Expenditures vs. Current
   Deductions .............................. 19
M. General Plan of Rehabilitation Doctrine ... 21
N. The Parties' Arguments ................... 23
O. Analysis ................................. 27

Issue II.   Brazilian Debt-Equity Conversion ............ 29
A. The Brazilian Debt Crisis ................ 31
   1. Deposit Facility Agreements and
      Blocked Deposits ...................... 31
   2. The Cruzado Plan ..................... 33
   3. Moratorium on Interest ................ 34
B. Petitioner's Blocked Deposits ............ 34
C. Papel e Celulose Catarinense, S.A. ....... 36
   1. PCC's Expansion Plans ................. 38
   2. Petitioner's Internal Analysis of a PCC
      Investment ............................ 39
   3. Petitioner's Conclusions About the PCC
      Investment ............................ 40
D. Steps Leading Up to the Conversion ....... 41
E. The Conversion Transaction ................ 42
F. Petitioner's Tax and Accounting Treatment
   of the Conversion ...................... 45
G. Petitioner's Return and Petition .......... 46
H. Notice of Deficiency ..................... 47
I. Subsequent Events ........................ 47
Discussion ................................... 47
J. Respondent's Arguments ................... 47
K. Petitioner's Arguments ................... 50
L. Law and Analysis ........................ 52

Issue III. Allocation of Purchase Price ................. 64
          A. FIA ......................................... 64
          B. Federal's Acquisition of FIA .............. 66
          C. Petitioner's Acquisition of FIA ........... 67
          D. Petitioner's 1989 Return .................. 71
          E. Notice of Deficiency ...................... 71
          Discussion .................................... 71
          F. Residual Value ............................ 72
          G. Expert Witnesses .......................... 73
             1. Petitioner's Expert ................... 74
             2. Respondent's Expert ................... 75
             3. Critique of Experts ................... 77
          H. Conclusion ................................ 80

OPINION

JACOBS, <u>Judge</u>:  In docket No. 20567-93, respondent determined deficiencies in petitioner's 1987 and 1988 Federal income taxes in the respective amounts of $93,413 and $3,999,398, as well as additional interest under section 6621(c) for 1988. Pursuant to an amended answer filed on September 23, 1994, respondent increased the amount of the 1988 deficiency to $4,644,201.

In docket No. 26213-93, respondent determined a deficiency in petitioner's 1989 Federal income tax in the amount of $10,532,064. Respondent increased the amount of the 1989 deficiency to $22,757,717 pursuant to an answer filed on February 14, 1994, and further increased the deficiency amount to $22,791,923 pursuant to a September 22, 1994, amendment to answer.

These cases were consolidated for trial, briefing, and opinion.

The issues for decisions are:[1] (1) Whether petitioner is entitled to deduct the costs of removing asbestos-containing materials from its Douglas Street bank building; (2) whether petitioner realized a loss on a Brazilian debt-equity conversion; and (3) whether any portion of the $141,456,620 petitioner paid to acquire the assets of Financial Investment Associates, Inc., should be allocated to goodwill, going-concern value, or other nonamortizable intangible assets.

All section references are to the Internal Revenue Code in effect for the years under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure.

For convenience and clarity, we have combined our findings of fact and opinion with respect to each issue. Some of the facts have been stipulated and are found accordingly. The stipulations of facts and the attached exhibits are incorporated herein by this reference.

## General Findings

Norwest Corporation (hereinafter petitioner or Norwest), a Delaware corporation, had its principal place of business in Minneapolis, Minnesota, at the time the petitions were filed. Norwest is the parent company of a group of corporations that filed

[1] With the exception of certain issues relating to foreign tax credits and petitioner's claim for additional research credits, all other issues have been resolved.
The increased deficiencies asserted in the answers and amended answers are not attributable to any issues before this Court.

consolidated corporate income tax returns for the years under consideration (1987 through 1989). Petitioner reports its income on a calendar-year basis, employing the accrual method of accounting. Petitioner timely filed its U.S. Corporation Income Tax Returns for 1987, 1988, and 1989.

Issue I.  Removal of Asbestos-Containing Materials

The first issue is whether petitioner is entitled to deduct the costs of removing asbestos-containing materials from its Douglas Street bank building.  Petitioner argues that the expenditures constitute section 162(a) ordinary and necessary expenses. Respondent, on the other hand, contends that the expenditures must be capitalized pursuant to section 263(a)(1). Alternatively, respondent contends that the expenditures must be capitalized pursuant to the "general plan of rehabilitation" doctrine.

A. The Douglas Street Building

One of petitioner's subsidiaries, Norwest Bank Nebraska, N.A. (Norwest Nebraska), owns a building at 1919 Douglas Street in Omaha, Nebraska (the Douglas Street building or building). The Douglas Street building is a three-story commercial office building that occupies half a square block and has a lower level parking garage. Norwest Nebraska constructed the building in 1969 at a $4,883,232 cost.  During all relevant periods, Norwest Nebraska used the Douglas Street building as an operations center as well as a branch for serving customers.

B. Remodeling Plans

In 1985 and 1986, Norwest Nebraska consolidated its "back room" operations at the Douglas Street building. Pursuant to that process, Norwest Nebraska undertook to determine the most efficient means for providing more space to accommodate the additional operations personnel within the building. The planning process indicated that the building needed a major remodeling. (The building had not been remodeled since its construction; Norwest Nebraska usually remodels its banks every 10 to 15 years.) Thus, by the end of 1986, petitioner and Norwest Nebraska had decided to completely remodel the Douglas Street building. In December 1986, both petitioner and Norwest Nebraska approved a preliminary budget of $2,738,000 for carpet, furniture, and improvements.

C. Use of Asbestos-Containing Materials in the Douglas Street Building

The Douglas Street building was constructed with asbestos-containing materials as its main fire-retardant material. (The local fire code required that buildings contain fireproofing material.) Asbestos-containing materials were sprayed on all columns, steel I-beams, and decking between floors. The health dangers of asbestos were not widely known when the Douglas Street building was constructed in 1969, and asbestos-containing materials were generally used in building construction in Omaha, Nebraska.

A commercial office building's ventilation system removes existing air from a room through a return air plenum as new air is

introduced.  The returned air is subsequently recycled through the building.  The area between the decking and the suspended ceiling in the Douglas Street building functioned as the return air plenum. The top part of the return air plenum, the decking, was one of the components of the building where asbestos-containing materials had been sprayed during construction.

Over time, the decking, suspended ceiling tiles, and light fixtures throughout the building became contaminated.  This contamination occurred because the asbestos-containing fireproofing had begun to delaminate, and pieces of this material reached the top of the suspended ceiling.

D.  Federal Asbestos Guidelines

In the 1970's and 1980's, research confirmed that asbestos-containing materials can release fibers that cause serious diseases when inhaled or swallowed. Diseases resulting from exposure to asbestos can reach the incurable stage before detection and can cause severe disability or death. Asbestosis is a progressive and disabling lung disease caused by inhaling asbestos fibers that become lodged in the lungs.  Persons exposed to asbestos may develop lung cancer or mesothelioma, an extremely rare form of cancer.

On March 29, 1971, the Environmental Protection Agency (EPA) designated asbestos a hazardous substance. The parties have stipulated that Federal, State, and local laws and regulations at all relevant times did not require asbestos-containing materials to

be removed from commercial office buildings if they could be controlled in place.  Nevertheless, building owners had to take precautions against the release of asbestos fibers.

The presence of asbestos in a building does not necessarily endanger the health of building occupants.  The danger arises when asbestos-containing materials are damaged or disturbed, thereby releasing asbestos fibers into the air (when they can be inhaled).

The Department of Labor, Occupational Safety and Health Administration (OSHA), has established standards and guidelines for permissible levels of employee exposure to asbestos.  Effective July 21, 1986, the permissible exposure limit for employees was 0.2 fiber (longer than 5 micrometers) per cubic centimeter of air, determined on the basis of an 8-hour time-weighted average.  At half of the permissible exposure limit (0.1 fiber per cubic centimeter of air), employers are required to begin compliance activities such as air monitoring, employee training, and medical surveillance.

Moreover, the EPA has established standards and guidelines for the general public's exposure to asbestos.[2]  The EPA-recommended guideline for general occupancy and clearance of a building after

---

[2]    In assessing the potential for fiber release, the EPA in 1985 recommended evaluating the current condition of asbestos-containing materials based on evidence of: (1) Deterioration or delamination; (2) physical damage (e.g., the presence of debris); and (3) water damage as well as the potential for future disturbance (based on proximity to air plenum or direct air stream, visibility, accessibility and degree of activity, as well as change in building use).

construction activities involving asbestos-containing materials is 0.01 fiber per cubic centimeter of air.

Asbestos removal must be performed by specially trained professionals wearing protective clothing and respirators. The work area must be properly contained to prevent release of fibers into other areas. Containment typically requires barriers of polyethylene plastic sheets with folded seams, complete with air locks and negative air pressure systems. Asbestos-containing materials that are removed must be wetted to reduce fiber release. Once removed, the materials must be disposed of in leak-tight containers in special landfills.

E. Testing at the Douglas Street Building and Decision To Remove Asbestos-Containing Materials

In October 1985, petitioner's general liability and property damage insurer, the St. Paul Property and Liability Insurance Co. (St. Paul), tested a bulk sample of fire-retardant material from the Douglas Street building's steel I-beams to determine whether the building contained asbestos. The results indicated that the material contained 8 to 10 percent chrysotile asbestos, the most common type of asbestos.

Petitioner obtained its umbrella insurance policies through Marsh & McLennan, which provided coverage over and above the St. Paul policies. In January 1987, at Marsh & McLennan's request, Clayton Environmental Consultants, Inc. (Clayton), conducted more extensive testing for the presence of asbestos at Norwest

facilities in South Dakota and Nebraska, including the Douglas Street building. On February 9, 1987, petitioner received notification that the January testing indicated that the sprayed-on fireproofing contained 8 to 10 percent chrysotile asbestos and the ceiling tiles on the parking level contained 26-percent chrysotile asbestos. This confirmed the St. Paul results.

At the request of Marsh & McLennan, Clayton conducted extensive additional testing for airborne asbestos-fiber concentrations in the Douglas Street building. On February 25, 1987, Clayton collected air samples from the building. On April 14, 1987, it issued the results of its survey, which indicated that the airborne asbestos fiber concentrations present during normal occupancy of the Douglas Street building ranged from 0.0002 to 0.006 fiber per cubic centimeter of air. The highest level of airborne fiber concentration at the Douglas Street building (0.006 fiber per cubic centimeter of air) did not exceed either the EPA or OSHA guidelines. There was, however, the expectation that the airborne asbestos-fiber concentrations would continue to increase. Moreover, the asbestos-containing fireproofing at the Douglas Street Building had characteristics that the EPA had identified as warranting removal of the material, such as evidence of delamination, presence of debris, proximity to an air plenum, and necessity of access for maintenance.

After considering the circumstances, petitioner decided to remove the asbestos-containing materials from the Douglas Street

building (other than the parking garage) in coordination with the overall remodeling project. Indeed, the remodeling could not have been undertaken without disturbing the asbestos-containing fireproofing. Thus, because petitioner and Norwest Nebraska chose to remodel, it became a matter of necessity to remove the asbestos-containing materials. Petitioner essentially decided that "managing the asbestos in place" was not a viable option, given the extent of remodeling that would disturb the asbestos.

Removing the asbestos-containing materials from the Douglas Street building at the same time as, and in connection with, the remodeling was more cost efficient than conducting the removal and renovations as two separate projects at different times. It also minimized the amount of inconvenience to building employees and customers.

As late as May 1988 (approximately 6 months after asbestos removal began) petitioner and Norwest Nebraska did not intend to remove the parking garage asbestos-containing materials. No remodeling was planned for the garage, and the materials were in sound condition. However, petitioner and Norwest Nebraska subsequently decided to remove the garage asbestos-containing materials as well, on the basis of their expectation that the garage tiles would eventually deteriorate, as well as the fact that it was financially advantageous to conduct this removal in connection with the ongoing abatement activity.

F.  Contractors and Work Performed

On August 4, 1987, Norwest Nebraska hired Hawkins Construction Co. (Hawkins), as general contractor, to perform the remodeling work at the Douglas Street building.  On November 30, 1987, Norwest Nebraska hired Waste Environmental Technology (WET) to remove the asbestos-containing materials from the building.  Norwest Nebraska also hired ATC Environmental, Inc., to perform on-site air monitoring during all asbestos-abatement activities at the building.

WET declared bankruptcy in 1988 and could not complete the project.  On December 5, 1988, Norwest Nebraska hired Michael T. Robinson Associates, Inc. (Robinson), to replace WET and complete removal of the asbestos-containing materials from the Douglas Street building.  At that time, Norwest Nebraska also replaced ATC Environmental, Inc., with Chart Services, Ltd.

The asbestos removal and remodeling were basically performed in 13 phases; each phase involved a defined area of the Douglas Street building.  For each phase, the asbestos-removal contractor removed the asbestos-containing materials before the general contractor began remodeling.  After setting up a containment area, the asbestos removal contractor physically removed the walls, floors, ceilings, and light fixtures, where necessary, to reach and remove the asbestos-containing materials. Once all the asbestos-containing materials had been removed from an area, the air was tested for airborne-fiber concentration before the containment

could be taken down and the general contractor could begin remodeling.

Removing all the asbestos-containing materials from the Douglas Street building was a large project, entailing an enormous amount of work. Nearly every suspended ceiling and light fixture on all four levels of the building had to be taken down. Asbestos-containing materials were removed from the entire building.

The asbestos fireproofing in the Douglas Street building was replaced with Cafco,[3] a mineral wool material. The ceiling tiles on the Farnam[4] parking level, as well as the floor tiles in the customer lobbies, were replaced with new, asbestos-free materials. Hawkins' subcontractors installed the replacement fireproofing and tiling.

Norwest Nebraska representatives, the asbestos-removal contractor, Hawkins, and Hawkins' subcontractors held meetings on a regular basis to coordinate the schedule for the remodeling work with the asbestos removal work. Petitioner had a financial interest in ensuring that the asbestos removal work was performed in a timely fashion and was properly coordinated with the remodeling work. (Delays caused by the asbestos-removal contractor resulted

---

[3]     At all relevant times, Cafco was not known to present any health hazards.

[4]     Farnam is one of the streets adjacent to the Douglas Street building.

in additional costs to Hawkins, which passed those costs on to petitioner.)

The removal of the asbestos-containing materials from the Douglas Street building was substantially completed by the end of May 1989. Following completion, Norwest Nebraska learned that the two elevator lobbies in the parking garage contained vinyl asbestos floor tile. Petitioner hired Technical Asbestos Control to remove and replace these tiles.

The removal of the asbestos-containing materials from the Douglas Street building did not extend the building's useful life.

G. Health Concerns

In addition to removing the asbestos-containing materials on account of the remodeling, petitioner also considered the health and welfare of its employees and customers. Even though the level of airborne asbestos fiber concentrations in the Douglas Street building did not exceed OSHA or EPA standards for exposure, the presence of asbestos-containing materials in the return air plenum nonetheless increased the possibility for release of asbestos fibers into the air: (1) The flow of air through the return air plenum made surface erosion of the asbestos-containing materials more likely; (2) the asbestos-containing materials had already started to delaminate or flake off, which was almost certain to become progressively worse; and (3) the necessity for working above the suspended ceiling in the return air plenum to replace light fixtures or computer cables created greater chances for disturbance

of the asbestos-containing materials, and made routine maintenance more expensive.

Petitioner intended to create a safer and healthier environment for the building employees by removing the asbestos-containing materials.[5] The building indeed became safer after the asbestos-containing materials were removed.

H. Liability Issues

By removing the asbestos-containing materials from the Douglas Street building, petitioner also intended to avoid or minimize its potential liability for damages from injuries to employees, customers, and workers resulting from asbestos exposure. Petitioner's general liability insurance policies in effect at all relevant times contained an exclusion for damages attributable to the discharge of pollutants. Such exclusion would include the circulation of asbestos fibers through the Douglas Street building's ventilation system. Some of petitioner's umbrella insurance policies contained an additional endorsement specifically excluding liability for damages caused by asbestos exposure.

Injuries to Douglas Street building employees arising out of, and in the course of, their employment are not covered under petitioner's general liability or umbrella insurance policies.

---

[5]    Before the asbestos removal and remodeling work began, John Cochran, president of Norwest Nebraska, wrote a memorandum dated Oct. 28, 1987, to the Douglas Street building employees, assuring them that Norwest Nebraska wanted their work environment to be safe.

Workmen's compensation insurance is the only coverage available for such injuries. It is unclear whether damages for injuries to the employees resulting from exposure to asbestos would be covered by workmen's compensation insurance. Nevertheless, petitioner was, and continues to be, at risk with respect to asbestos damage claims brought by Douglas Street building employees.

Furthermore, by removing the asbestos-containing materials from the building, petitioner intended to avoid or minimize a potential increase in its premiums for workmen's compensation insurance. If asbestos damage claims filed by Douglas Street building employees were, in fact, covered by workmen's compensation insurance, the increase in petitioner's premiums could be sizable, depending on the volume and magnitude of such claims.

I. Tax and Accounting Matters

The total cost of renovating the Douglas Street building was close to $7 million, comprising nearly $4,998,749 in remodeling costs and approximately $1.9 million[6] in asbestos removal costs.

_____

[6]   According to a schedule petitioner prepared, entitled "Norwest Bank Nebraska N.A.--Payments Related to the Asbestos Abatement", petitioner's costs of removing the asbestos-containing materials from the Douglas Street building were as follows:

| Year | Amount |
|------|--------|
| 1987 | $ 175,095.00 |
| 1988 | 861,471.30 |
| 1989 | 881,769.77 |
| Total | 1,918,336.07 |

(continued...)

Petitioner considered the cost of all demolition done by the asbestos removal contractors (including the cost of removing the asbestos tiles) as a removal cost for both book and tax purposes. Petitioner considered the cost of any demolition done by the general contractor or one of the subcontractors a remodeling cost for both book and tax purposes.

All construction-related remodeling costs were added to the basis of the building and depreciated on a straight-line basis over 31.5 years. The portion of the remodeling costs for furniture and fixtures was written off over 7 years.

### J. Petitioner's Returns and Petitions

On its 1987 and 1988 returns, petitioner claimed neither depreciation nor ordinary deductions with respect to the costs of removing the asbestos-containing materials from the Douglas Street building. On its 1989 return, however, petitioner claimed a $7,696 depreciation deduction and a $902,206 ordinary and necessary business deduction with respect to such expenditures.

Petitioner asserts in its petitions that it properly deducted the $902,206 on its 1989 return. In addition, petitioner claims

---

[6](...continued)
Respondent agrees that these amounts properly represent the asbestos removal costs, except for $2,836.61 paid on Apr. 7, 1989, in settlement of a lien filed by a materialman.
    We note, however, that petitioner's general ledger reflects a $1,945,816 total incurred for the asbestos removal between 1987 and 1989. This amount does not include the cost of replacing the asbestos-containing materials with asbestos-free materials. There is no explanation in the record for the discrepancy between the $1,918,336.07 and the $1,945,816.

that it is also entitled to ordinary and necessary business deductions for the costs of removing the asbestos-containing materials from the Douglas Street building for tax years 1987 and 1988 in the respective amounts of $175,095 and $863,764 (which amounts, petitioner claims, were inadvertently omitted from its 1987 and 1988 returns).

### K.  Notice of Deficiency

In the notice of deficiency, respondent disallowed petitioner's $902,206 ordinary and necessary deduction for asbestos-removal expenditures.

## Discussion

At issue is whether petitioner's costs of removing the asbestos-containing materials are currently deductible pursuant to section 162 or must be capitalized pursuant to section 263 or as part of a general plan of rehabilitation.

### L. Capital Expenditures vs. Current Deductions

Section 263 requires taxpayers to capitalize costs incurred for permanent improvements, betterments, or restorations to property.  In general, these costs include expenditures that add to the value or substantially prolong the life of the property or adapt such property to a new or different use.  Sec. 1.263(a)-1(b), Income Tax Regs.  In contrast, section 162 permits taxpayers to currently deduct the costs of ordinary and necessary expenses (including incidental repairs) that neither materially add to the value of property nor appreciably prolong its life but keep the

property in an ordinarily efficient operating condition.  See sec. 1.162-4, Income Tax Regs.

Deductions are exceptions to the norm of capitalization. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). An income tax deduction is a matter of legislative grace; the taxpayer bears the burden of proving its right to a claimed deduction.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

In Illinois Merchants Trust Co. v. Commissioner, 4 B.T.A. 103, 106 (1926), which involved the cost of shoring up a wall and repairing a foundation needed to prevent a building from collapsing, the Board of Tax Appeals drew the following distinctions:

> To repair is to restore to a sound state or to mend, while a replacement connotes a substitution.  A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. * * * Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *

The distinction between repairs and capital improvements has also been characterized as follows:

> "The test which normally is to be applied is that if the improvements were made to 'put' the particular capital asset in efficient operating condition, then they are capital in nature.  If, however, they were made merely to 'keep' the asset in efficient operating

> condition, then they are repairs and are deductible."

Moss v. Commissioner, 831 F.2d 833, 835 (9th Cir. 1987), revg. T.C. Memo. 1986-128 (quoting Estate of Walling v. Commissioner, 373 F.2d 190, 192-193 (3d Cir. 1967), revg. and remanding 45 T.C. 111 (1965)).

The Court in Plainfield-Union Water Co. v. Commissioner, 39 T.C. 333, 338 (1962), articulated a test for determining whether an expenditure is capital by comparing the value, use, life expectancy, strength, or capacity of the property after the expenditure with the status of the property before the condition necessitating the expenditure arose (the Plainfield-Union test). Moreover, the Internal Revenue Code's capitalization provision envisions an inquiry into the duration and extent of the benefits realized by the taxpayer. See INDOPCO, Inc. v. Commissioner, supra at 88.

Whether an expense is deductible or must be capitalized is a factual determination. Plainfield-Union Water Co. v. Commissioner, supra at 337-338. Courts have adopted a practical case-by-case approach in applying the principles of capitalization and deductibility. Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 14 (1979). The decisive distinctions between current expenses and capital expenditures "are those of degree and not of kind." Welch v. Helvering, supra at 114.

M.  General Plan of Rehabilitation Doctrine

Expenses incurred as part of a plan of rehabilitation or improvement must be capitalized even though the same expenses if incurred separately would be deductible as ordinary and necessary. United States v. Wehrli, 400 F.2d 686, 689 (10th Cir. 1968); Stoeltzing v. Commissioner, 266 F.2d 374 (3d Cir. 1959), affg. T.C. Memo. 1958-111; Jones v. Commissioner, 242 F.2d 616 (5th Cir. 1957), affg. 24 T.C. 563 (1955); Cowell v. Commissioner, 18 B.T.A. 997 (1930).  Unanticipated expenses that would be deductible as business expenses if incurred in isolation must be capitalized when incurred pursuant to a plan of rehabilitation.  California Casket Co. v. Commissioner, 19 T.C. 32 (1952).  Whether a plan of capital improvement exists is a factual question "based upon a realistic appraisal of all the surrounding facts and circumstances, including, but not limited to, the purpose, nature, extent, and value of the work done".  United States v. Wehrli, supra at 689-690.

An asset need not be completely out of service or in total disrepair for the general plan of rehabilitation doctrine to apply. For example, in Bank of Houston v. Commissioner, T.C. Memo. 1960-110, the taxpayer's 50-year-old building was in "a general state of disrepair" but still serviceable for the purposes used (before, during, and after the work) and was in good structural condition. The taxpayer hired a contractor to perform the renovation (which included nonstructural repairs to flooring, electrical wiring,

plaster, window frames, patched brick, and paint, as well as plumbing repairs, demolition, and cleanup). Temporary barriers and closures were erected during work in progress. The Court recognized that each phase of the remodeling project, removed in time and context, might be considered a repair item, but stated that "The Code, however, does not envision the fragmentation of an over-all project for deduction or capitalization purposes." The Court held that the expenditures were not made for incidental repairs but were part of an overall plan of rehabilitation, restoration, and improvement of the building.

### N. The Parties' Arguments

Petitioner contends that the costs of removing the asbestos-containing materials are deductible as ordinary and necessary business expenses because: (1) The asbestos removal constitutes "repairs"[7] within the meaning of section 1.162-4, Income Tax Regs.; (2) the asbestos removal did not increase the value of the Douglas Street building when compared to its value before it was known to contain a hazardous substance--a hazard was essentially removed and the building's value was restored to the value existing prior to the discovery of the concealed hazard;[8] (3) although performed

_____

[7] Petitioner states in its opening brief that "The law recognizes that removing an unsafe condition is a repair rather than an improvement", citing Schmid v. Commissioner, 10 B.T.A. 1152 (1928).

[8] Petitioner introduced the reports and testimony of two expert witnesses concerning the impact of the asbestos removal
(continued...)

concurrently, the asbestos removal and remodeling were not part of a general plan of rehabilitation because they were separate and distinct projects, conceived of independently, undertaken for different purposes, and performed by separate contractors; and (4) using the principles of section 213 (which allows individuals to deduct certain personal medical expenses that are capital in nature) and section 1.162-10, Income Tax Regs. (which allows a trade or business to deduct medical expenses paid to employees on account of sickness), the cost of removing a health hazard is deductible under section 162.[9]

Respondent, on the other hand, contends that the costs of removing the asbestos-containing materials must be capitalized because: (1) The removal was neither incidental nor a repair;[10] (2)

---

[8](...continued)
costs on the value of the Douglas Street building. These experts opined that the discovery of asbestos as a health hazard in combination with the extent of asbestos present in the building resulted in an immediate diminution in the value of the building. (One of the experts testified that the building would be appraised as if it did not contain asbestos, and then the amount it would cost to repair the condition would be deducted from the appraisal.) The expert testimony supports petitioner's argument that the asbestos removal merely restored the original value of the building (i.e., without hazardous fireproofing) but did not enhance its value.

[9] Petitioner also relies on Rev. Rul. 79-66, 1979-1 C.B. 114, which allows, under limited circumstances, a sec. 213 deduction for an individual taxpayer's costs of removing and covering lead-based paint in a personal residence, to the extent the costs exceed the increase in the residence's value.

[10] Respondent contends that petitioner's reliance on Schmid v. Commissioner, supra, is misplaced. The Board of Tax
(continued...)

petitioner made permanent improvements that increased the value of the property[11] by removing a major building component and replacing it with a new and safer component, thereby improving the original condition of the building; (3) petitioner permanently eliminated the asbestos hazard that was present when it built the building, creating safer and more efficient operating conditions and reducing the risk of future asbestos-related damage claims and potentially higher insurance premiums; (4) the asbestos removal and the remodeling were part of a single project to rehabilitate and improve the building; (5) the purpose of the expenditure was not to keep the property in ordinarily efficient operating condition, but to effect a general restoration of the property as part of the remodeling; and (6) section 213 and section 1.162-10, Income Tax Regs., are not analogous to the present case.

The parties also disagree as to whether the Plainfield-Union test is appropriate for determining whether petitioner's asbestos removal expenditures are capital. Petitioner contends that it is the appropriate test because the condition necessitating the

---

[10](...continued)
Appeals held that the funds expended by the taxpayer in that case were to "maintain * * * [a store] in a safe condition and may be properly classified as repairs and deductible as an expense." 10 B.T.A. at 1152. Respondent posits that the operative word leading to the Board of Tax Appeals' classification of the taxpayer's expenditures as deductible repair expenses was "maintain", and not the words "safe condition", as petitioner suggests.

[11]     Respondent did not introduce any expert testimony concerning the value of the Douglas Street building.

asbestos removal was the discovery that asbestos is hazardous to human health. Accordingly, until the danger was discovered, petitioner argues that the physical presence of the asbestos had no effect on the building's value. Only after the danger was perceived could the contamination affect the building's operations and reduce its value.[12]

Petitioner points to Rev. Rul. 94-38, 1994-1 C.B. 35, which cites Plainfield-Union in addressing the proper treatment of costs to remediate soil and treat groundwater that a taxpayer had contaminated with hazardous waste from its business. The ruling treats such costs (other than those attributable to the construction of groundwater treatment facilities) as currently deductible.

Respondent, on the other hand, argues that the discovery that asbestos is hazardous and that the Douglas Street building contained that substance is not a relevant or satisfactory reference point. Respondent contends that the Plainfield-Union test does not apply herein because a comparison cannot be made between the status of the building before it contained asbestos and after the asbestos was removed; since construction, the building has always contained asbestos. In cases where the Plainfield-Union test has been applied (such as Oberman Manufacturing Co. v. Commissioner, 47 T.C. 471, 483 (1967); American Bemberg Corp. v. Commissioner, 10 T.C. 361, 370

_____

[12] In its reply brief, petitioner states: "While in a metaphysical sense the Douglas Street Building may have been contaminated in 1970, such contamination had no discernable impact until the hazard became known."

(1948), affd. 177 F.2d 200 (6th Cir. 1949); and <u>Illinois Merchants Trust Co. v. Commissioner</u>, 4 B.T.A. 103 (1926)), respondent continues, the condition necessitating the repair resulted from a physical change in the property's condition. In this case, no change occurred to the building's physical condition that necessitated the removal expenditures. The only change was in petitioner's awareness of the dangers of asbestos. Accordingly, respondent argues that the <u>Plainfield-Union</u> test is inapplicable, and the Court must examine other factors to determine whether an increase in the building's value occurred.

Respondent also disagrees with petitioner's reliance on Rev. Rul. 94-38, <u>supra</u>, arguing that the present facts are distinguishable. The remediated property addressed in the ruling was not contaminated by hazardous waste when the taxpayer acquired it. The ruling permits a deduction only for the costs of remediating soil and water whose physical condition has changed during the taxpayer's ownership of the property. Under this analysis, the taxpayer is viewed as restoring the property to the condition existing before its contamination. Thus, respondent contends, unlike Rev. Rul. 94-38, petitioner's expenditures did not return the property to the same state that existed when the property was constructed because there was never a time when the building was asbestos free. Rather, the asbestos-abatement costs improved the property beyond its original, unsafe condition.

O. Analysis

We believe that petitioner decided to remove the asbestos-containing materials from the Douglas Street building beginning in 1987 primarily because their removal was essential before the remodeling work could begin. The extent of the asbestos-containing materials in the building or the concentration of airborne asbestos fibers was not discovered until after petitioner decided to remodel the building and a budget for the remodeling had been approved. Because petitioner's extensive remodeling work would, of necessity, disturb the asbestos fireproofing, petitioner had no practical alternative but to remove the fireproofing. Performing the asbestos removal in connection with the remodeling was more cost effective than performing the same work as two separate projects at different times. (Had petitioner remodeled without removing the asbestos first, the remodeling would have been damaged by subsequent asbestos removal, thereby creating additional costs to petitioner.) We believe that petitioner's separation of the removal and remodeling work is artificial and does not properly reflect the record before us.

The parties have stipulated that the asbestos removal did not increase the useful life of the Douglas Street building. We recognize (as did petitioner) that removal of the asbestos did increase the value of the building compared to its value when it was known to contain a hazard. However, we do not find, as respondent advocates, that the expenditures for asbestos removal materially

increased the value of the building so as to require them to be capitalized. We find, however, that had there been no remodeling, the asbestos would have remained in place and would not have been removed until a later date. In other words, but for the remodeling, the asbestos removal would not have occurred.[13]

The asbestos removal and remodeling were part of one intertwined project, entailing a full-blown general plan of rehabilitation, linked by logistical and economic concerns. "A remodeling project, taken as a whole, is but the result of various steps and stages." Bank of Houston v. Commissioner, T.C. Memo. 1960-110.[14] In fact, removal of the asbestos fireproofing in the Douglas Street building was "part of the preparations for the remodeling project." See id. Before remodeling could begin, nearly every ceiling light fixture in the building was ripped down and crews removed all the asbestos-containing materials that had been sprayed on the columns, I-beams, and decking between floors, as well as the floor tiles in the customer lobbies. Only then could the remodeling contractor perform its work. As described above, the

_____

[13] While no remodeling was done in the parking garage, the record indicates that it was financially advantageous to remove the asbestos-containing materials in the parking garage at the same time as the abatement activity throughout the building.

[14] Petitioner attempts to distinguish Bank of Houston v. Commissioner, T.C. Memo. 1960-110, from the present case by arguing that only one contractor was used in Bank of Houston while it used two. We do not find that distinction to be of any significance. Two different contractors were necessary in this case because removing the asbestos-containing materials required special skills that the remodeling contractor did not possess.

entire project required close coordination of the asbestos removal and remodeling work.

Clearly, the purpose of removing the asbestos-containing materials was first and foremost to effectuate the remodeling and renovation of the building. Secondarily, petitioner intended to eliminate health risks posed by the presence of asbestos[15] and to minimize the potential liability for damages arising from injuries to employees and customers.

In sum, based on our analysis of all the facts and circumstances, we hold that the costs of removing the asbestos-containing materials must be capitalized because they were part of a general plan of rehabilitation and renovation that improved the Douglas Street building.

Issue II.  Brazilian Debt-Equity Conversion

The second issue is whether petitioner realized a loss on a 1987 Brazilian debt-equity conversion.[16] According to petitioner, the debt-equity conversion should be viewed under the step transaction doctrine as an exchange of petitioner's blocked deposits at the Central Bank of Brazil (with a basis of $12,577,136) for

---

[15]   We reject petitioner's argument regarding sec. 213, sec. 1.162-10, Income Tax Regs., and Rev. Rul. 79-66, 1979-1 C.B. 114.  These provisions and ruling cannot convert the costs of removing the asbestos-containing materials into current deductions simply because petitioner's "concerns for the health and welfare of its employees" partially motivated the removal.

[16]   A "debt-equity conversion" is also commonly referred to as a "debt-equity swap".

stock in a Brazilian company (with a fair market value of $5,544,000). Consequently, the conversion produces a $7,033,136 loss. By utilizing the step transaction doctrine, petitioner essentially ignores the conversion of the Brazilian debt into cruzados and simultaneously the payment of the cruzados for the stock.

Respondent, on the other hand, asserts that the step transaction doctrine is inapplicable to petitioner's debt-equity conversion. According to respondent, we should view the transaction as an exchange of petitioner's blocked deposits for cruzados, which were then used to purchase stock in a Brazilian company. Based on this scenario, petitioner would recognize a loss on the exchange of the debt for the cruzados only to the extent its adjusted basis in the debt exceeded the fair market value of the cruzados. Respondent contends that there was no excess (and thus, no loss) in this case: petitioner exchanged blocked deposits with a $12,577,136 basis for cruzados with a $12,577,136 fair market value. As an alternative position, respondent claims that, assuming arguendo petitioner did realize a loss, the loss did not exceed 10 percent of the investment, or approximately $1.25 million.

A. The Brazilian Debt Crisis

In the late 1970's, Latin American countries borrowed heavily abroad. As part of its response to higher world oil prices, the Brazilian Government embarked on a major program of import-substituting industrialization. This development strategy involved

the potential risk of higher external indebtedness.  The extensive borrowing made Brazil vulnerable when international interest rates rose sharply in the early 1980's.  It was difficult for Brazil to maintain sufficient foreign currency (such as the U.S. dollar) to repay its foreign debts.

In 1982, Mexico announced that it could not meet external debt payments and declared a moratorium on its external indebtedness. A general cutback in credit to most Latin American nations, including Brazil, followed.

### 1. Deposit Facility Agreements and Blocked Deposits

Brazil attempted to deal with its debt problems by negotiating with its foreign creditors to reschedule its indebtedness. The negotiations resulted in various agreements including the 1983 and 1984 Deposit Facility Agreements (DFA's), and a 1986 amendment to the 1984 DFA (the 1986 DFA). Under the terms of these agreements, the principal amount of the loans made by international banks to Brazilian financial institutions maturing in 1983, 1984, and 1986[17] would not be paid to creditors outside Brazil but rather would be deposited with the Central Bank of Brazil (the Central Bank)[18] in dollar-denominated accounts on behalf of the respective creditors.

---

[17]    Despite the lack of a formal renewal, this arrangement was continued into 1985.

[18]    The Central Bank is the principal banking regulatory agency in Brazil, as well as the agency in charge of implementing and enforcing national monetary policy, regulating money supply, and controlling foreign exchange.

-34-

These were called "blocked deposits".  Under the DFA's and the 1986 DFA, the payment terms of the deposits were also rescheduled.

Moreover, under the terms of these agreements, blocked deposits relating to loans maturing in 1983, 1984, and 1985 could be re-lent by the creditors to borrowers in Brazil.  Blocked deposits for loans maturing in 1986 (such as the deposits at issue herein) could not be re-lent but could be used for equity investments in Brazilian companies.  This type of transaction is called a "debt-equity conversion".  In a debt-equity conversion transaction, non-Brazilian currency-denominated blocked deposits at the Central Bank are exchanged for cruzados at the official exchange rate, and thereafter the cruzados are used as payment for equity interests in Brazilian companies, subject to Central Bank guidelines and pursuant to the DFA's and the 1986 DFA. Such a transaction can take place only after negotiations with and agreement by the Central Bank.

Blocked deposits at the Central Bank were bought and sold on a secondary market at a discount to their face amounts. This secondary market originally reflected rates at which banks exchanged debt of one country against that of another, attempting to diversify their portfolios.  Ultimately, the transactions on the secondary market involved sales of all types of claims by banks wishing to clear their portfolios of the specific loans.  Throughout most of 1986, Brazilian debt was trading in the secondary market at 75 cents on the dollar, declining to 63 cents by April 14, 1987 (the date of

the transaction herein, discussed <u>infra</u>). In April 1987, the majority of Brazilian debt was not traded on the secondary market.

The Brazilian Government did not have access to the secondary market because the debt restructuring agreements (such as the DFA's) had sharing clauses requiring the recipient of any payments to share the proceeds with all of the other creditors that were parties to such agreements.

### 2.  The Cruzado Plan

In February 1986, Brazil adopted the "Cruzado Plan" as part of an economic stabilization program to reduce the country's high inflation.  A price freeze took effect, and the cruzado replaced the cruzeiro as Brazil's currency on February 28, 1986. The exchange was made at one cruzado (Cz$) to 1,000 cruzeiros.[19]  Brazilian currency was not freely exchangeable through official Brazilian channels into non-Brazilian currency.  The Cruzado Plan was collapsing by late 1986.

### 3.  Moratorium on Interest

On February 20, 1987, Brazil declared a moratorium on the payment of interest on its external indebtedness.  In response to

---

[19]    On Feb. 28, 1986, the official exchange rate of cruzados to U.S. dollars was set at $1 to Cz$13.84.  The 1986 average official exchange rate was $1 to Cz$13.654.
The official rate was the dominant exchange rate in Brazil. A "parallel" rate also existed (which was published in Brazilian newspapers) but was technically illegal, and none of the hundreds of Brazil's creditors, including petitioner, could exchange blocked deposits for cruzados in the parallel market.  The spread between the official rate and parallel rate typically was approximately 30 percent.

this declaration, some U.S. banks, including petitioner, announced that they would place a portion of their Brazilian loans on nonaccrual status, recording interest income on such loans only as payments were received. By November 1987, Brazil resumed partial interest payments on its external indebtedness.

B. Petitioner's Blocked Deposits

Petitioner's subsidiary, Norwest Bank Minneapolis, N.A. (NBM), owned blocked deposits at the Central Bank in 1986 and 1987.[20] As described above, these deposits consisted of principal repayments of dollar-denominated loans previously made to Brazil in the ordinary course of NBM's banking business. The Central Bank prevented petitioner from repatriating these deposits because Brazil had insufficient hard currency (U.S. dollars) to make payments on the loans. At petitioner's election, the blocked deposits accrued interest at the U.S. domestic rate.

In late 1986, petitioner began investigating the possibility of using some of its Brazilian blocked deposits to make an equity investment in a Brazilian company. Darin P. Narayana managed international banking for Norwest at this time and was in charge of petitioner's Brazilian blocked deposits. A debt-equity conversion became attractive to petitioner because it would: (1) Allow petitioner to regain control over some assets by placing them

---

[20] Because NBM was a subsidiary of petitioner, for convenience we sometimes refer to petitioner as owner of the blocked deposits.

outside of Brazil's debt-restructuring process; (2) increase the probability of repayment of a portion of its outstanding Brazilian loans; and (3) reduce petitioner's obligation to make new loans to Brazil sufficient to pay at least part of the interest due on old loans.

At this time (and until July 1987), Brazil's policies favored debt-equity conversion transactions. Creditors were permitted to use 1986 deposits to invest in Brazilian companies. If a creditor decided to make such an investment, the Central Bank converted 100 percent of the face value[21] of the deposits, plus accrued interest, into cruzados at the official exchange rate. Pursuant to Central Bank Circular 1.492 (the implementing measure concerning debt-equity conversions), the creditor and the company in which it was investing pledged "to keep the converted sums in Brazil for the minimum period that may be established." The debt-equity conversion policies benefited Brazil by allowing it to extinguish its foreign debt by the amount of the debt converted, thereby eliminating its foreign exchange obligation with respect to that portion of its debt.

The equity investment acquired as a result of a debt-equity conversion was registered at the Central Bank as registered foreign capital in the currency originally brought into Brazil by the creditor. The amount registered could be increased annually by the amount of retained earnings. Registration entitled the creditor to

_____

[21]    In July 1987, the Central Bank ended the practice of converting blocked deposits at full face value.

remit profits and capital outside Brazil at the official exchange rate, avoid or reduce supplementary withholding taxes and, upon the ultimate sale of the investment, remit the proceeds of the sale free of tax up to the amount of registered foreign capital. In February 1987, when Brazil declared a temporary moratorium on interest payments on its debt, foreign investors possessing a certificate of registration were still able to receive dividends outside Brazil at the official exchange rate.

Petitioner had several options with respect to its 1986 blocked deposits:[22] (1) Hold the blocked deposits and participate in the debt restructuring process; (2) sell the deposits on the secondary market to another party; or (3) convert the deposits into an equity interest in a Brazilian company pursuant to the Central Bank's debt-equity conversion program. The only options that would reduce petitioner's blocked deposit holdings and decrease its foreign debt exposure were selling the debt on the secondary market for cash or swapping the debt for equity in a Brazilian company.

C. Papel e Celulose Catarinense, S.A.

Petitioner decided to engage in a debt-equity conversion and in that regard began examining investment possibilities in Brazilian companies. In November 1986, petitioner received an Information

---

[22] Petitioner could only use 1986 deposits to participate in the debt-equity conversion at issue in this case. These deposits were governed by the 1984 and 1986 DFA's.

Memorandum[23] regarding a Brazilian company, Papel e Celulose Catarinense, S.A. (PCC), prepared by Banco Bozano, Simonsen de Investimento, S.A. (Banco Bozano) and Morgan Grenfell & Co., Ltd.[24] The International Finance Corporation (IFC),[25] a World Bank affiliate, engaged these firms to market its 28.7-percent interest in PCC.[26] IFC's asking price for its 28.7-percent interest in PCC was $25 million.

PCC, headquartered in San Paulo, was a subsidiary of Industrias Klabin Papel e Celulose, S.A. (IKPC), a Brazilian corporation incorporated in 1934. IKPC was the largest pulp and paper producer in South America and among the 100 largest in the world. Prior to the transaction at issue herein, PCC's stock was owned as follows: IKPC--70.9 percent; IFC--28.7 percent; and PCC's Administration

[23]    The Information Memorandum did not by its terms limit the offering to prospective purchasers who intended to engage in a debt-equity conversion.

[24]    At the time petitioner was considering an investment in PCC, it was also reviewing a possible investment in Medtronic do Brazil, as well as the purchase of Mellon Bank's 12.5-percent interest in Banco Bozano.

[25]    IFC aids in the development of private sector projects in developing countries, such as providing "seed capital" to private ventures and projects. IFC focuses its assistance on those projects which, while economically and financially attractive, cannot by themselves attract enough managerial, technical, or financial resources to be implemented. Once these projects reach success and maturity, IFC expects to divest and redeploy its assets to assist the development of new attractive ventures.

[26]    PCC was IFC's oldest equity investment, dating back to the late 1960's.  By 1986, IFC had decided that PCC's operational and financial maturity warranted the sale of its interest.

Council--.4 percent. PCC stock was not publicly traded, whereas IKPC stock was listed on the Brazilian stock exchanges.

PCC was engaged in the production of unbleached and bleached kraft paper and bleached fluff pulp as well as multiwall paper bags and envelopes. PCC's management and the management of its principal subsidiaries were fully integrated with that of its parent, IKPC. PCC's directors had all been in the Klabin group for more than 30 years.

Paper consumption is closely linked to economic activity. Consequently, swings in economic activity place pulp and paper manufacturers at risk. Prior to 1986, PCC had been consistently profitable. (For example, its 1985 net income was $13,453,000.) From 1976 through 1985, PCC paid dividends averaging approximately 31 percent of its net profits. In 1986, PCC was cash rich and had only a small amount of long-term indebtedness. As of December 31, 1985, PCC had cash and short-term financial investments totaling $11,430,000; long-term loans totaled $2,166,000. PCC's shareholders' equity at the end of 1985 was approximately $125 million.

### 1. PCC's Expansion Plans

The Brazilian pulp and paper industry operated at or close to full capacity in 1985 and 1986. Additional investments in productive capacity were needed to meet Brazil's 7-percent annual growth in paper demand. PCC planned to expand its production capacity from 80,200 to 178,700 tons per year in order to meet expected demand. By early 1987, the cost of PCC's planned expansion

was $115 million. PCC intended to finance this expansion with a $55 million loan from the Brazilian National Development Bank, a $30 million loan from IFC, and $30 million from internally generated cash flow.

On November 19, 1986, PCC acquired 80 percent of Bates' stock, one of its principal Brazilian competitors. The purchase price was approximately $9 million. The Bates acquisition enabled PCC to expand its capacity in the multiwall-paper-bag market.

2. Petitioner's Internal Analysis of a PCC Investment

At the request of NBM's International Department, Norwest Corporate Finance[27] evaluated IFC's 28.7-percent equity interest in PCC at the beginning of 1987. The evaluation resulted in a February 1987 study (Corporate Finance study). At this time, NBM was contemplating the acquisition of IFC's entire 28.7-percent interest.

Norwest Corporate Finance reviewed the forecast prepared by PCC's management and found it reasonable, based on the available information. It found that the projected level of sales and profitability from the planned increase in capacity was reasonable and concluded that PCC was not underperforming in comparison with its Brazilian competitors.

The Corporate Finance study used both the market and income approaches to value IFC's interest in PCC. The market approach

[27] Norwest Corporate Finance was responsible for the corporation's policies with regard to the deployment of its assets and liabilities.

involved the application of a price/earnings ratio based on U.S. companies in the pulp and paper industry to a 3-year weighted average of historical earnings, while the income approach discounted PCC's expected dividends to present value at a 24-percent rate. The Corporate Finance study concluded that IFC's 28.7-percent interest in PCC had a value of $22,783,000 under the market approach and $16,884,000 under the income approach. In attempting to harmonize the two methods, the study accorded the income approach twice the weight of the market approach and concluded that the 28.7-percent interest in PCC had a $18,850,000 value. The study did not consider the repatriation restriction or the foreign exchange political risks associated with owning a Brazilian investment.

As holder of more than 10 percent of PCC's share capital, petitioner would be entitled, as a matter of Brazilian law, to elect a representative to each of the two councils responsible for PCC's management, the Council of Administration and the Fiscal Council. Petitioner anticipated receiving fees for each of the two seats on PCC's management councils in the amount of $7,500 per month in cruzados, or the cruzado equivalent of $180,000 annually. By February 23, 1987, petitioner had revised its value for IFC's 28.7-percent interest in PCC to $24 million by adding the director's fees from one board seat to projected dividends from PCC under the Corporate Finance study's income approach.

### 3.  Petitioner's Conclusions About the PCC Investment

Petitioner concluded that the acquisition of a 14.361-percent equity interest in PCC (rather than the entire 28.7-percent interest) was an attractive investment.  It based its conclusions on PCC's: (1) Strong professional management; (2) solid financial condition; (3) history of profitability and dividends; (4) dominant position in the markets for its products; (5) growth potential; and (6) relationship with IFC, both past and future.  As of April 14, 1987, petitioner could have sold $12,577,136 of its Brazilian debt on the secondary market for 63 percent of face value and received $7,923,596 million in return, but it chose not to do so.  Petitioner believed that a 14.361-percent equity interest in PCC through a debt-equity conversion (in which it would receive 100 cents on the dollar) was more profitable than the cash it could have received on the secondary market.

### D.  Steps Leading Up to the Conversion

On February 24, 1987, NBM sent to Banco Bozano a proposal to purchase 14.35 percent of PCC's equity for a purchase price not to exceed $12.5 million.[28] The other 14.361 percent was to be acquired by the Bank of Scotland and its affiliate, Balmoral Industria e Comercio, Ltda. (Balmoral), as a result of a debt-equity conversion

---

[28]     The proposal states that the purchase is to "be effected by means of a conversion" of blocked deposits with a $12.5 million face value.

which would occur simultaneously with petitioner's debt-equity conversion. Petitioner negotiated the purchase of IFC's PCC stock at arm's length.

Once the parameters of the acquisition had been established, NBM wrote to the Central Bank on April 2, 1987, seeking its consent to engage in a debt-equity conversion (pursuant to Central Bank Circulars 1.125 and 1.492, Central Bank Resolution 1.189, and the 1986 DFA) that would enable the use of blocked deposits with a face amount of approximately $12.5 million to acquire 32,524,650 shares of PCC common stock (the 14.361-percent equity interest).

In order to execute the transaction, on April 7, 1987, petitioner formed a wholly owned Cayman Islands subsidiary, Minnetonka Overseas Investment, Ltd. (MOIL), which in turn formed a wholly owned Brazilian subsidiary, Minnetonka Representacoes Comerciais, Ltda. (MRC). (MOIL and MRC are controlled foreign corporations within the meaning of subpart F of the Internal Revenue Code.) Petitioner chose this arrangement in order to allow it the maximum flexibility in the future disposition of its investment.

Also on April 7, 1987, MOIL notified the Central Bank that NBM's blocked deposits would be converted into MRC risk capital. This capital would be used to purchase the PCC stock. The conversion was to occur on April 14, 1987. Petitioner, through MRC, requested that the Central Bank register MRC's investment as

registered foreign capital within 30 days of the investment. Moreover, NBM, MOIL, and MRC agreed to maintain the invested funds in Brazil "for a period of twelve (12) years", which was the "period to which funds relative to deposits made in 1986" were subject.

On April 10, 1987, NBM and MOIL instructed the Central Bank to transfer $12,577,136[29] of blocked deposits to the "name of MRC".

### E.  The Conversion Transaction

On April 14, 1987, IFC, NBM, MOIL, MRC, the Bank of Scotland, and Balmoral executed a Share Purchase Agreement (Purchase Agreement). In relevant part, the Purchase Agreement states as follows:

> Each of the Purchasers shall pay to the Seller at the place and to the person or account in Brazil designated by the Seller the purchase price for the Relevant Purchaser's Shares, equal to the Brazilian Cruzado equivalent of US$12,500,000 without any deduction, setoff or withholding whatsoever, obtained by converting into Cruzados Brazilian Sovereign Debt * * *

Under the Purchase Agreement, IFC was entitled to either the immediate remittance in dollars in New York of $25 million or the deposit of the sale proceeds in a dollar-denominated account satisfactory to IFC at the Central Bank.

---

[29]    We note that $77,136 of the $12,577,136 was used to pay legal expenses and the buy/sell foreign exchange rate differential.

As contemplated, petitioner's blocked deposits totaling $12.5 million were converted on April 14, 1987, at the official exchange rate of 23.616 cruzados to one U.S. dollar, into Cz$295,200,000. MRC in turn transferred the cruzados to IFC in consideration for 50 percent of IFC's equity interest in PCC, some 32,524,650 shares. IFC provided MRC a receipt acknowledging this payment.[30] This transaction extinguished the $12.5 million debt; moreover, petitioner agreed to maintain its equity investment in Brazil for 12 years.

Also on April 14, 1987, IFC and MOIL entered into a Repatriation Guarantee Agreement, whereby IFC guaranteed that in the event MOIL sold the PCC stock and was unable to repatriate the

---

[30] The receipt states, in relevant part, as follows:

> IN THIS FORM, INTERNATIONAL FINANCE CORPORATION ("IFC"), * * * acknowledges receipt of Cz$ 295.200.000,00 (Two hundred, ninety five million, two hundred thousand cruzados), equivalent to US$ 12,500,000 (twelve million five hundred thousand dollars) as of this date of April 14 at the exchange rate of Cz$ 23,616 from MINNETONKA REPRESENTACOES COMERCIAIS LTDA. ("MINNETONKA"), * * * for the sale to the latter of 32,524,650 shares from the capital stock of PAPEL E CELULOSE CATARINENSE S.A., * * * of which shares IFC is the legal owner, * * * for which receipt IFC hereby grants MINNETONKA total, general and irrevocable quittance for said sale of shares.

sale proceeds, IFC would purchase, for U.S. dollars outside of Brazil, MOIL's share holding in MRC equal to MOIL's remittance interest, up to $12.5 million. This guaranty would be reduced by any earlier sale or disposition of any part of the shares and would apply only during the convertibility period (the 18-month period beginning on the 12th anniversary of the PCC purchase). (Petitioner's blocked deposits at the Central Bank had no such guaranty.)

Following the debt-equity transaction, IKPC held 70.842 percent of PCC's voting capital, and MRC and Balmoral each held 14.361 percent. The three parties entered into a Shareholders Agreement on April 30, 1987, whereby IKPC and Balmoral had a right of first refusal with respect to the sale of petitioner's PCC stock.

Due to the manner in which petitioner arranged the transaction, it could sell its investment indirectly, through the sale of MOIL, at any time and without restriction, for U.S. dollars outside Brazil. The buyer would have to maintain the invested funds in Brazil for whatever portion of the 12-year waiting period remained, but it would be free to dispose of the investment indirectly, in the same manner as petitioner. Moreover, petitioner could dispose of the investment by causing MOIL to sell the stock of MRC, without restriction, to a buyer in Brazil for cruzados.

The cruzado proceeds would remain subject to the same prohibition on repatriation, until April 14, 1999.

F. Petitioner's Tax and Accounting Treatment of the Conversion

NBM's chief financial officer and comptroller, Phil Williams, reviewed and analyzed the Corporate Finance study. Two days after the conversion he concluded that the estimated fair market value of petitioner's 14.361-percent equity interest in PCC was between $12.4 million and $12.6 million. Mr. Williams arrived at this conclusion by using the price/equity ratio and discounted cash-flow approaches, as well as adding a third approach, based on the net book value of PCC. He then weighted the three approaches equally.[31] Mr. Williams recommended that the investment be recorded at par. In April 1987, Mr. Narayana (who was in charge of petitioner's Brazilian blocked deposits) agreed with Mr. Williams' conclusion.

---

[31]     Mr. Williams determined the fair market value of petitioner's interest in PCC as follows (numbers are in thousands):

| Method | Total Company | | | Norwest's Share |
|---|---|---|---|---|
| Price/earnings ratio | $ 79,385 | x | 14.361% = | $11,400 |
| Discounted cash-flow | 79,790 | x | 14.361% = | 11,459 |
| Net book value | [1]100,386 | x | 14.361% = | 14,416 |
| Weighted average | $ 86,520 | | | $12,425 |

[1] Discounted 20 percent.

Norwest's International Department was responsible for monitoring the value of petitioner's PCC investment on a quarterly basis. Petitioner periodically reviewed all of its lesser developed country debt. On July 3, 1987, Mr. Williams wrote a memorandum, on behalf of International Management, reassessing the value of petitioner's PCC equity interest. Based on a June 12, 1987, Proposed Practice Bulletin issued by the American Institute of Certified Public Accountants and its own analysis that the true fair market value of the debt surrendered would be 85 percent of par, petitioner decided to write down its PCC investment to approximately $10.7 million, based on a 15-percent discount.

At the end of 1987, petitioner again reduced the value of the PCC investment to $8 million for financial purposes. This value was based on the secondary market value of the $12,577,136 debt and on petitioner's Tax Department's analysis of the tax implications resulting from the debt-equity transaction.

G.  Petitioner's Return and Petition

On its 1987 Federal income tax return, petitioner claimed a $4,577,136 loss (the difference between its $12,577,136 of blocked deposits and $8 million, the secondary market price for the $12,577,136 of Brazilian debt as well as petitioner's final valuation for book purposes of the PCC stock received in the debt-equity conversion). Petitioner asserted in its petition: "Since

the PCC stock was valued at $8,000,000 when it should have been valued at $681,099, Petitioner is entitled to an additional loss deduction of $7,318,901 for 1987."

### H. Notice of Deficiency

In the notice of deficiency, respondent disallowed petitioner's claimed $4,577,136 loss. The notice explains that petitioner did not establish that any deductible loss was sustained in 1987.

### I. Subsequent Events

Petitioner attempted to sell its interest in PCC several weeks after the conversion. Then, in 1992 or 1993, petitioner engaged Eden International to assist in the sale of its PCC stock. On December 1, 1994, petitioner entered into a Deferred Stock Sale Agreement with Tiquie, S.A., a subsidiary of IKPC located in Uruguay, agreeing to sell the MOIL shares to Tiquie for $10,500,000, consisting of $1,150,000 in cash and a $9,350,000 note, plus interest on the outstanding balance of the purchase price. By selling its entire interest in MOIL, petitioner indirectly sold the 14.361-percent equity interest in PCC, as well as cash equivalents of approximately $658,000. Petitioner incurred $260,000 in closing costs.

Petitioner sold its remaining blocked deposits for 47 cents on the dollar in January 1988.

Discussion

J. Respondent's Arguments

Respondent contends that petitioner did not realize a loss on the debt-equity conversion because it simply exchanged blocked deposits in which it had a $12,577,136 basis for cruzados worth the same amount. Respondent relies upon Rev. Rul. 87-124, 1987-2 C.B. 205, and G.M. Trading Corp. v. Commissioner, 103 T.C. 59 (1994), supplemented by 106 T.C. 257 (1996), on appeal (5th Cir., Oct. 4, 1996), to support its position.

In Rev. Rul. 87-124, supra, a U.S. commercial bank holds dollar-denominated debt at the central bank of a foreign country. The foreign country has a program that allows the commercial bank to exchange the debt for local currency if it uses the local currency to invest in a company (the foreign company) organized and engaged in business in the foreign country. In situation 2, the commercial bank delivers the dollar-denominated debt to the central bank. The central bank credits the account of the foreign company and the foreign company in turn issues its capital stock to the commercial bank. (Respondent contends that the facts herein are similar except that petitioner paid the local currency, cruzados, to a third party, IFC, in exchange for the stock.) The ruling treats the commercial bank as if it received local currency from the central bank in exchange for the debt and then contributed the

local currency to the foreign company in exchange for its stock. The commercial bank also recognizes a loss on the exchange of the debt for the local currency to the extent of the excess of its adjusted basis in the debt over the fair market value of the local currency. The ruling assumes that the fair market value of the stock is equal to the fair market value of the foreign currency for which it was exchanged.

By applying the test enunciated in this ruling, respondent argues that petitioner did not realize a loss on its exchange of blocked deposits for cruzados because it received local currency (cruzados) equal in value to its basis in the blocked deposits. Moreover, respondent contends that petitioner recognizes no gain or loss on the exchange of the cruzados for the PCC stock because the ruling assumes that the value of the cruzados and the value of the stock are identical.

Respondent also contends that G.M. Trading Corp. v. Commissioner, supra, supports its position. G.M. Trading involved a U.S. taxpayer that participated in a Mexican debt-equity swap. In order to participate in the transaction, the taxpayer, a U.S. company, formed a Mexican subsidiary, Procesos. The U.S. company then purchased a previously issued $1.2 million Mexican Government debt from an unrelated bank for $634,000 (which reflected the market discount rate of approximately 50 percent of the debt's

principal face amount).    103 T.C. at 62, 65.    The taxpayer exchanged the $1.2 million debt for 1,736,694,000 pesos (Mex$),[32] and the Mexican Government deposited the pesos in Procesos' restricted bank account.    The pesos were to be used to build a lambskin processing plant.    Procesos issued shares of its stock to the Mexican Government, which in turn transferred the shares to the taxpayer. The U.S. company surrendered the debt to the Mexican Government, which then canceled it.    Id. at 63-64.    The Court rejected the taxpayer's view that the transaction was a tax-free contribution to the capital of the Mexican subsidiary.    The Court declined to disregard the taxpayer's exchange of U.S. dollar-denominated debt for Mexican pesos and held that the taxpayer realized a $410,000 gain on the exchange, equal to the difference between the taxpayer's basis in the debt ($634,000) and the fair market value of the pesos for which the debt was exchanged (Mex$1,736,694,000 with a fair market value of $1,044,000 on the date of the transaction).    Id. at 68-71.

By analogy to G.M. Trading, respondent asserts that in the instant situation we should decline to disregard petitioner's

---

[32]    The Mex$1,736,694,000 had a $1,044,000 fair market value at the official exchange rate.    The $1.2 million debt had a fair market value of $1,044,000 because of a 13-percent discount rate of the debt's face value.    G.M. Trading Corp. v. Commissioner, 103 T.C. 59, 63 (1994), supplemented by 106 T.C. 257 (1996), on appeal (5th Cir., Oct. 4, 1996).

exchange of blocked deposits for cruzados. Accordingly, respondent claims we should hold that petitioner's exchange of blocked assets for cruzados created no loss because the basis of the blocked assets and the fair market value of the cruzados were identical.

K. Petitioner's Arguments

At trial and on brief, petitioner contends that the conversion produced a $7,033,136 loss. Petitioner argues that it exchanged $12,577,136 of blocked deposits, which had a secondary market value of $7,923,596, for Brazilian stock worth $5,544,000. Petitioner first argues that Rev. Rul. 87-124, supra, supports its position rather than that of respondent. Petitioner claims that because the value of the stock is presumed to equal the value of the local currency given in exchange, petitioner is justified in looking to the fair market value of the stock it received in determining the extent of its loss.

Petitioner also argues that we should not follow the analysis and reasoning of G.M. Trading because the facts therein are distinguishable: (1) Petitioner entered into the debt-equity conversion as a means of cutting its losses on a deteriorating investment, not as the first step in making a profitable new investment, as in G.M. Trading; (2) the cruzados petitioner received were used to acquire stock in a Brazilian company, while the pesos the taxpayer received in G.M. Trading were used to

acquire land and construct a plant; and (3) petitioner was committed to retain the PCC investment for 12 years, while no similar mandatory holding period existed in G.M. Trading.

Moreover, petitioner contends that unlike G.M. Trading, the step transaction doctrine applies herein; thus, the exchange of debt for cruzados and the cruzados conversion into stock should be ignored. Therefore, according to petitioner, the gain or loss should be measured by the difference between the basis in the debt and the fair market value of the stock received. In order to place a value on the stock, petitioner submitted the expert report of Nancy Czaplinski, who valued petitioner's interest in the PCC stock as of the transaction date at $5,544,000. Petitioner also submitted the expert report and testimony of Steven J. Sherman, who valued the same interest at approximately $6.77 million.[33]

Finally, petitioner claims that the value of its blocked deposits on the secondary market is directly relevant to the value of its equity interest in PCC. According to petitioner, the $12,577,136 of blocked deposits had a $7,923,596 value on the

---

[33] Respondent's appraisal experts, Scott Hakala and William Cline, valued the interest at $12 million and $12.5 million, respectively.

secondary market, which represents a ceiling on the value of petitioner's PCC equity interest.[34]

L.  Law and Analysis

The loss from a sale of property is the excess of the property's adjusted basis over the amount realized. Sec. 1001(a). An equal exchange results in neither gain nor loss.  Because debt is considered property in the hands of the holder, an exchange of debt for other property is usually treated as a section 1001 taxable exchange. Cottage Sav. Association v. Commissioner, 499 U.S. 554, 559 (1991); G.M. Trading Corp. v. Commissioner, 103 T.C. at 67.  Federal tax law principles require that foreign currency be considered property.  FNMA v. Commissioner, 100 T.C. 541, 582 (1993); sec. 1.1001-1(a), Income Tax Regs.

The step-transaction doctrine is a rule of substance over form that treats a series of formally separate "steps" as a single transaction if they are in substance integrated, interdependent, and geared toward a specific result.  Tandy Corp. v. Commissioner, 92 T.C 1165, 1171 (1989). The step-transaction doctrine is a manifestation of the more general tax law principle that formal distinctions cannot obscure the substance of a transaction. Id.

---

[34]    Respondent counters by arguing that the value of the blocked deposits on the secondary market is irrelevant because petitioner chose to partake in a debt-equity conversion rather than sell the debt on the secondary market.

Like petitioner herein, the taxpayer in G.M. Trading argued that its exchange of debt for foreign currency should be ignored under the step transaction doctrine. The Court in G.M. Trading rejected the taxpayer's argument in its Supplemental Opinion, as follows:

> a step in a series of transactions or in an overall transaction that has a discrete business purpose and a discrete economic significance, and that appropriately triggers an incident of Federal taxation, is not to be disregarded. Further, the simultaneous nature of a number of steps does not require all but the first and the last (or "the start and finish") to be ignored for Federal income tax purposes. * * *

106 T.C. at 267.

We likewise refuse to apply the step transaction doctrine herein. We agree with respondent that the substance of petitioner's transaction was consistent with its form. The Central Bank converted the full-face value of petitioner's debt, plus accrued interest, into Cz$295,200,000 at the official exchange rate without diminution or discount. MRC received the cruzados from the Central Bank (exchanged at the official exchange rate) and paid the cruzados to a third party (IFC) in exchange for its 14.361-percent equity interest in PCC. Contrary to petitioner's contention, the exchange of the debt for the cruzados and the conversion of the cruzados into stock did not constitute a transitory step but rather a substantive and significant element

of the conversion, having a discrete business purpose and economic significance: (1) Petitioner needed the cruzados to pay the agreed purchase price to IFC and pay its other transaction expenses; (2) the Central Bank was entitled to extinguish approximately $12.5 million of Brazil's foreign debt; (3) the Central Bank did not need to use its limited supply of U.S. dollars at this time; (4) the Central Bank received petitioner's assurance that its equity investment would remain in Brazil for 12 years; and (5) IFC could use the cruzados without restriction.

Thus, taking into account the cruzados' independent economic significance, petitioner's exchange of blocked deposits for cruzados and the conversion of the cruzados into stock cannot be ignored under the step transaction doctrine. Accordingly, we follow the analysis in G.M. Trading[35] and hold that petitioner's loss, if any, is measured by the difference between its basis in the blocked deposits ($12,577,136) and the value of the cruzados ($12,577,136 before any discount, see infra) on the date of the transaction. Because we hold that the step transaction doctrine is inapplicable herein, we need not determine the fair market value

---

[35] While we agree with petitioner that the facts in G.M. Trading Corp. v. Commissioner, 103 T.C. 59 (1994), are not identical to those herein, the legal propositions stated in G.M. Trading are nonetheless applicable herein.

of petitioner's 14.361-percent equity interest in PCC,[36] including

any possible marketability discount attributable to that interest.

We reject petitioner's argument that Rev. Rul. 87-124, 1987-2 C.B.

205, supports its position.

At this point, we must address petitioner's argument that the

$12,577,136 of blocked deposits had a secondary market value of

$7,923,596. We agree with respondent that the value of the blocked

deposits on the secondary market is irrelevant to this case.

Petitioner did not engage in a transaction on the secondary

---

[36]     Assuming arguendo that the step transaction doctrine
applies, we would hold that the PCC stock had a $12.5 million
fair market value on Apr. 14, 1987, based upon the following:
     After considering for several months whether to invest in
PCC, petitioner concluded that the 14.361-percent equity interest
was worth $12.5 million. Petitioner negotiated the purchase of
the PCC stock with IFC (an unrelated party, which has a strong
institutional incentive to charge a fair price) at arm's length,
even though the Latin American debt crisis placed petitioner in a
position with limited options. Petitioner was not under a
compulsion to buy.  In fact, two of petitioner's experts
testified that if we find that IFC sold its stock in an arm's-
length transaction and petitioner was not under a compulsion to
buy, the price at which the transaction occurred would provide
the best evidence of fair market value. The amount paid for
property generally is probative evidence of its fair market
value. See, e.g., United States v. Cartwright, 411 U.S. 546, 551
(1973).
     Just 2 days after petitioner acquired the interest in PCC,
Phil Williams, NBM's chief financial officer, concluded that the
fair market value of the PCC stock was between $12.4 and $12.6
million.  He reached this conclusion after analyzing and revising
the study prepared by Norwest Corporate Finance.  We consider
petitioner's subsequent reductions in value for financial
reporting purposes not relevant to the purchase-date fair market
value of the PCC stock.

market. It chose to participate in the government repurchase market where the Central Bank paid full face value for the debt. Our task is to decipher the events that did occur, rather than those that could have occurred. Mr. Narayana, petitioner's officer charged with overall responsibility for the debt-equity conversion, testified that petitioner considered the conversion more beneficial than a sale of the debt on the secondary market. Furthermore, as the Court's Supplemental Opinion in G.M. Trading acknowledges, a creditor is motivated to engage in a debt-equity conversion by the additional value the transaction creates, above and beyond the secondary market sale of the debt. If not for this added value, a creditor would have no reason to spend the time and resources necessary to complete the transaction. 106 T.C. at 260-261.

It is clear that petitioner engaged in the debt-equity conversion because it concluded, after extensive investigation and analysis of the investment, that a 14.361-percent equity investment in PCC was worth more than the approximately $8 million cash petitioner could have received from a secondary market sale. Contrary to petitioner's argument, the value of the blocked deposits on the secondary market is not relevant to the value of petitioner's PCC equity interest and does not represent a ceiling on that value. While we acknowledge that had petitioner sold the

blocked deposits on the secondary market, it probably would have been obligated to make new loans to Brazil, petitioner anticipated receiving a "better deal" through the debt-equity conversion.

Our analysis does not, however, end here. We must now determine whether any discount should be applied to the fair market value of the cruzados petitioner received on account of the restrictions in this case.

Two restrictions existed with regard to petitioner's debt-equity conversion. The first required petitioner to invest the cruzados in a Brazilian company. This restriction has no greater significance than the restrictions placed upon the taxpayer's use of the pesos by the Mexican Government in G.M. Trading. The Court in G.M. Trading declined to discount the value of the pesos received in exchange for the debt on the grounds that the Mexican Government restricted their use to the construction of the processing plant. The Court held that this restriction was consistent with the parties' purpose and objective and was not substantially different from disbursements of loan proceeds by financial institutions. 106 T.C. at 262. In other words, the restriction only reflected the foreign currency's intended use. 103 T.C. at 70-71. In fact, the restriction served as an enhancement to the value of the pesos by opening business opportunities for the taxpayer in Mexico. 106 T.C. at 264.

We acknowledge that due to the Brazilian debt crisis, petitioner had limited options with regard to its blocked deposits. However, once petitioner decided to engage in a debt-equity transaction, it was free to use its blocked deposits to invest in any Brazilian company. Moreover, the value of the cruzados here was enhanced because petitioner's investment was made at the official exchange rate, entitling it to the benefits of registered foreign capital. In sum, as in G.M. Trading, we hold that the restriction on use of the cruzados herein does not require a discount.

The second restriction involved the 12-year repatriation restriction. It is clear from the record before us that this restriction was a preexisting limitation, as articulated in Central Bank Circular 1.492 and the 1986 DFA. It was not a result of negotiations or bargaining by the parties. The restriction reduced the value of petitioner's property right by prohibiting petitioner from repatriating its capital for 12 years. Despite the manner in which petitioner arranged the transaction (with the creation of MOIL and MRC), we believe that the 12-year restriction warrants a discount on the fair market value of the cruzados petitioner received, reflecting the preexisting restriction. See, e.g., Landau v. Commissioner, 7 T.C. 12, 16 (1946) (the Court imposed a discount on the value of South African pounds,

reflecting preexisting restrictions imposed upon foreign exchange by South Africa). Accordingly, we will present the analyses of the parties' experts regarding the effect of the 12-year restriction.

Respondent argues that assuming arguendo petitioner realized a loss as a result of its debt-equity conversion, the loss did not exceed 10 percent of its investment (approximately $1.25 million) on account of the 12-year restriction. This argument is based upon the report and testimony of respondent's expert, Dr. William R. Cline. Dr. Cline received a Ph.D. in economics from Yale University in 1969, is a senior fellow at the Institute for International Economics, and has approximately 25 years' experience in the area of international debt, particularly Latin American and Brazilian debt. Dr. Cline concluded that petitioner realized no loss on its debt-equity conversion. However, he recognized that petitioner may be entitled to a small discount on the fair market value of the cruzados it received, attributable to its agreement to maintain its equity investment in Brazil for 12 years, despite its creation of MOIL and MRC in order to minimize the effects of the 12-year restriction.

Dr. Cline determined a discount on account of the restriction by considering the spread between the interest rates on a 3-month U.S. Treasury bill and a 10-year U.S. Treasury bond between 1964

and 1987.  For this period, the average annual interest rate on 10-year U.S. Treasury bonds exceeded the rate on 3-month U.S. Treasury bills by 1.1 percent.  This is the annual premium for short-term liquidity versus illiquidity over a 10-year period. Dr. Cline determined that the differential, if compounded over a 12-year period, amounts to a multiple of 1.14, and that the general market preference for liquidity means that the 12-year encumbrance is worth a 12.3-percent discount.  He then decreased the 12.3-percent discount to 10 percent based on his belief that the spread between the bill and the bond represented not only a liquidity premium, but also a risk premium for interest rate fluctuations.

Petitioner introduced a rebuttal witness, Dr. Kenneth Froot, of the National Economic Research Associates, Inc. Dr. Froot received a Ph.D. in economics from the University of California at Berkeley in 1986. He has no direct experience with Brazil. Petitioner also introduced Nancy Czaplinski, a chartered financial analyst and an engagement director with American Appraisal Associates, Inc.  Ms. Czaplinski has an M.B.A in finance from the University of Wisconsin at Milwaukee and is a C.P.A.

Dr. Froot first criticized Dr. Cline's use of U.S. Treasury bills and bonds because they are both highly liquid instruments. Ms. Czaplinski also criticized Dr. Cline's use of the interest

rate spread between the bill and the bond between 1964 and 1987 because it was significantly less than the actual spread at the valuation date, the average spread for 1987, and the average spread for 1983 through 1987. After correcting the spread used in Dr. Cline's analysis, Ms. Czaplinski used Dr. Cline's formula to arrive at a 25-percent discount solely attributable to liquidity in the U.S. Treasury market on the valuation date.[37]

Dr. Froot also insisted that Dr. Cline's 10-percent discount was too low.  Froot concluded that a total 54.5-percent discount was more appropriate for the following reasons: (1) The "swap equity" was akin to restricted stock, which trades at 26- to 40-percent discounts; (2) a significant discount is applicable because the official and parallel exchange rates could be expected to merge over a period of time, so that petitioner would not have the benefit of a favorable cruzado-to-dollar exchange rate at the end of the 12-year waiting period;[38] and (3) a discount rate

---

[37]     In response to the criticism of both Dr. Froot and Ms. Czaplinski, Dr. Cline testified that even though the 10-year bond is highly liquid, the buyer faces the same waiting period before maturity as the seller, and his discount represents an inherent penalty for the waiting period.

[38]     At the time of the transaction, the official exchange rate was 23.616 cruzados to one U.S. dollar, while the parallel rate was 32.250 cruzados to one U.S. dollar.
    Dr. Froot opined that if a convergence of the official and parallel Brazilian exchange rates occurred, petitioner would pay a 100 million cruzado "penalty" upon entering the debt-equity

(continued...)

adjustment was necessary for the risk associated with the official rate premium.

We believe that the 12-year waiting period was not a restriction on sale but rather a restriction on repatriation of dollars out of Brazil. Even if petitioner could not take the sale proceeds out of Brazil in dollars, it could sell MRC at any time to a buyer in Brazil paying cruzados. Petitioner could also sell MOIL for dollars outside Brazil. Petitioner's PCC equity investment was not equivalent to restricted stock.

By focusing on Dr. Froot's opinion that the fair market value of the cruzados should be determined by reference to the parallel market exchange rate, petitioner attempts to escape the tax consequences of its bargain.[39] While we agree with Dr. Froot

---

[38](...continued)
conversion because it was "forced" to use the official exchange rate and would receive none of this "penalty" back if the official and parallel rates converged prior to the end of the 12-year period. Dr. Froot believed that the spread was likely to narrow.

In April 1987, Dr. Cline would have predicted that the spread between the official exchange and parallel rates was likely to continue for a considerable period of time because Brazil had imbedded indexation as a result of chronic inflation. Also, Mr. Narayana believed that a spread would persist for a long time in the absence of drastic action by the Brazilian Government. In fact, a spread still existed in 1995.

[39] See G.M. Trading Corp. v. Commissioner, 106 T.C. at 263-264 (where the taxpayer was unsuccessful in attempting to disavow the price that the Mexican Government had agreed to pay and the taxpayer had agreed to accept in exchange for the debt).

that petitioner could have obtained more cruzados at the parallel market rate than at the official rate, the Central Bank required that the conversion take place at the official exchange rate. This was not a penalty; it was a requirement of engaging in the debt-equity conversion. As part of the conversion terms, petitioner agreed that blocked deposits would be converted into cruzados at the official exchange rate on April 14, 1987. Petitioner also agreed, as part of the Purchase Agreement, that it would pay IFC, in exchange for the PCC stock, the cruzados equivalent of $12.5 million, without any deduction, setoff, or withholding whatsoever, obtained by converting Brazilian blocked deposits into cruzados at the official exchange rate. IFC acknowledged receipt of this cruzado payment and the fact that it was the equivalent of $12.5 million at the official exchange rate on April 14, 1987. Thus, we reject Dr. Froot's recommendation of a discount on account of the official and parallel rate differentials as an after-the-fact attempt to revalue a transaction contrary to its agreed-upon terms.

Moreover, investments made in Brazil at the official exchange rate were entitled to the benefits of registered foreign capital status; investments made at the parallel rate were not. In this sense, the Cz$295,200,000 that petitioner obtained by converting its blocked deposits could easily have the same, if not greater,

value than an identical amount of cruzados obtained on the parallel market for fewer U.S. dollars.

Finally, we agree with Dr. Cline that no discount should be applied for the possible elimination of the official rate premium at the end of the 12-year waiting period. Foreign investors, such as petitioner, who received dividends from their registered investments would continue to receive the benefits of a favorable cruzado-to-dollar exchange rate during the years that the official rate premium was shrinking. Dr. Cline believed that a narrowing of the spread between the official and parallel market rates would likely be accompanied by an overall improvement in economic conditions, which would have a positive impact on the value of equity investments. In this regard, Dr. Cline testified that he would forgo a 25-percent exchange rate premium for a 100-percent increase in the value of his investment.

Determining an appropriate discount rate with mathematical precision is impossible. "Valuation is * * * necessarily an approximation * * *. It is not necessary that the value arrived at * * * be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence." Anderson v. Commissioner, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178; see also Estate of Barudin v. Commissioner, T.C. Memo.

1996-395.  While we find Dr. Cline's analysis generally sound, based on all of the evidence before us, we believe, and accordingly hold, that the 12-year repatriation restriction warrants a 15-percent discount, rendering a $1,886,570 loss for petitioner's 1987 tax year.

Issue III.  Allocation of Purchase Price

The final issue concerns the value of a lease portfolio petitioner acquired from Financial Investment Associates, Inc. (FIA). In this regard, we must determine whether any portion of the $141,456,620 petitioner paid in 1989 to acquire the assets of FIA should be attributed to goodwill, going-concern value, or other nonamortizable intangible assets.  Petitioner contends that none of the $141,456,620 it paid for FIA's assets should be allocated to goodwill, going-concern value, or other nonamortizable intangible assets. Respondent, on the other hand, contends that $1,328,618 of the $141,456,620 should be allocated to nonamortizable intangible assets.

A. FIA

FIA, a medical equipment leasing company, was founded by Fred Rafanello in 1977. At FIA's incorporation, Mr. Rafanello was its sole owner, president, and chief executive officer (CEO). FIA's principal executive offices were located in Northfield, Illinois.

FIA specialized in the leveraged purchase and leasing of high-tech diagnostic medical equipment to hospitals and clinics.

FIA's leases typically ran for 60 months, which was less than the estimated useful life of the leased equipment. FIA financed its equipment purchases using a combination of debt and equity. Debt (which generally represented approximately 90 percent of the cost of equipment) was typically in the form of a 60-month, nonrecourse loan from a money-center bank. Prior to FIA's acquisition by Commercial Federal Corp., discussed infra, FIA obtained equity financing from syndications,[40] assembled by investment bankers.

FIA customarily received an up-front fee or commission from the syndications, out of which the investment bankers received their fee. At the expiration of the lease term, the debt incurred to acquire the equipment being leased was retired, and the syndications' investors owned the equipment outright.

High-tech medical diagnostic equipment, particularly of the type leased by FIA, tends to have higher residual values than most other kinds of leased equipment. FIA projected the residual value of the equipment it leased to be in the range of 20 to 35 percent

---

[40] FIA was a general partner in the syndications and received additional remuneration by sharing in the residual value of the leased equipment with the syndications' investors.

of the equipment's cost. But, in fact, the equipment's residual values generally exceeded the amounts projected.[41]

FIA converted the equipment's residual value into cash at the end of the lease in a number of ways: Sale or renewal of the lease to the original lessee; sale or lease to another, generally smaller, hospital; or return of the equipment to the manufacturer as a trade-in. FIA's experience was that 85 to 90 percent of the equipment was purchased or released by the original lessee. In this regard, approximately 70 to 80 percent of the leases were renewed, which was more profitable for FIA than a sale of the equipment to the original lessee or a sale or lease to another hospital.

The amount of revenue that FIA could earn after the lease expiration depended largely on the residual value of the equipment. The residual value of the equipment was the source for over two-thirds of FIA's cash-flow before expenses and represented the principal source of FIA's profit. Thus, the equipment's residual value was the key to FIA's business.

B. Federal's Acquisition of FIA

Commercial Federal Corp. (Federal), the holding company of Commercial Federal Savings & Loan Association (CFSLA), was one of

---

[41] Through Dec. 31, 1987, FIA achieved gains of 29 percent over book residual values.

the largest retail financial institutions in the Midwest. On November 7, 1986, Federal, through another of its subsidiaries, Commercial Federal Investment Associates, Inc. (Commercial), acquired all of FIA's outstanding stock from Mr. Rafanello. The purchase price, approximately $5.3 million, included a 25-percent premium over FIA's book value.[42]

After the acquisition, FIA operated its business affairs with no significant changes. Mr. Rafanello remained FIA's president and CEO. At this time, FIA had 70 to 75 employees and financed $50 million of new equipment leases per year.[43]

Federal became FIA's source of equity financing, making funds available in the form of short-term intercompany loans. FIA had a $40 million line of credit with CFSLA, which it used to obtain funds for the purchase of equipment. Loans made under this credit line were secured by the equipment and the lease revenues.

FIA achieved higher residual values after its acquisition by Federal than prior to the acquisition.

C. Petitioner's Acquisition of FIA

On December 29, 1988, Norwest Leasing, Inc. (NLI), one of petitioner's affiliates, made an exploratory proposal to purchase

---

[42] Mr. Rafanello testified that the 25-percent premium was paid for FIA's intangible assets.

[43] By 1988, FIA financed more than $100 million of new equipment leases.

FIA's assets.  The proposal contemplated a purchase price premium of $2 to $5 million above FIA's net asset value[44] which, at the time, was approximately $17.5 million. The proposal also stated that NLI would pay FIA's $15 million intercompany debt to Federal.

By early February 1989, petitioner had decided it was willing to pay only a $1 million premium above book value for FIA's assets.  Petitioner thereafter negotiated an additional price reduction of $400,000 due to fluctuations in the bond market (which increased the cost of funding the acquisition).

Finally, on March 31, 1989, Norwest Financial Resources (NFR), another of petitioner's affiliates, entered into a purchase agreement (the March Agreement) with FIA and Commercial in which it agreed to acquire substantially all of FIA's receivables and assets.[45]  NFR specifically agreed to acquire FIA's approximately

---

[44]    The term "net asset value" refers to the book value or stockholders' equity of a company that appears on its balance sheet.  Net asset value is a reference for determining how much a potential buyer might be willing to pay for assets on a going-concern basis.

[45]    The March Agreement defines "Receivables" and "Assets" as follows:

> The term "Receivables" shall mean the operating leases and the underlying equipment or other property subject to such operating leases owned by the Company on the Closing Date; the leasing receivables (including leases, fair market value leases and direct finance leases), conditional sale contracts, secured loans and other commercial finance receivables of the Company on
> (continued...)

$100 million worth of equipment held under operating leases and leasing, and other commercial finance receivables, and to assume the nonrecourse indebtedness and other liabilities of approximately $52 million to which such assets were subject. The acquired assets represented over 98 percent of FIA's total assets.

---

[45](...continued)
the Closing Date; and any instruments or collateral securing the same and any equipment or property leased or otherwise financed and files and other records owned or in the possession of the Company or any of its affiliates relating thereto. Such receivables shall include (but not be limited to) all lease agreements, conditional sale contracts, notes, evidences of indebtedness, personal guarantees, corporate guarantees, letters of credit and other documents representing or backing up such receivables. Receivables shall not, in any event, include Excluded Assets.

The term "Assets" shall mean the Receivables; equipment or other property held in inventory for future sale or lease; all furniture, fixtures, equipment and the Company's rights in leasehold improvements; leasing and lending transactions in process for prospective lessees or borrowers and the related files, applications and other documentation; the Company's general partnership interests in partnerships and co-ownership interests in participation or like arrangements, its rights to receive fees, distributions and other revenues therefrom in the future, and any rights it has under management or supplier agreements related thereto; and any other assets owned by the Company on the Closing Date, other than Excluded Assets.

The "Excluded Assets" that NFR did not acquire consisted solely of notes receivable and any other amounts due FIA from its affiliates and other related parties as of the closing date. As of Dec. 31, 1988, notes receivable were $192,708, and amounts due FIA from its affiliates or other related parties were $540,520.

The March Agreement included the following provision with regard to goodwill (the goodwill provision):

> It is understood that there is no good will [sic] or similar intangible assets included in the purchase and sale covered by this Agreement and that no part of the purchase price shall be attributed or allocated in any way to good will [sic].

In addition, the March Agreement allowed NFR to designate an affiliate (or affiliates) to complete the purchase. NFR designated NLI and Dial Bank (Dial), NFR's State banking subsidiary. Consequently, on June 12, 1989, NLI and Dial completed the purchase from FIA and Commercial in an arm's-length transaction.[46] NLI and Dial paid $77,952,168 and $63,504,452, respectively, for a total purchase price of $141,456,620. The purchase price was calculated as follows:

```
        Stockholder's equity (based on historical balance sheet
          values, before purchase accounting adjustments)
  -     Excluded assets
  +     FIA notes payable to Commercial or its affiliates
  +     Income taxes (as shown on historical balance sheet)
  +     Other liabilities NFR did not specifically assume
  +     $390,000 ($100,000 for use of trade name and $290,000 for
          noncompete agreement)
        _____
  =     Total purchase price per purchase agreement
```

---

[46] While NFR actually entered into the March Agreement and designated NLI and Dial to complete the purchase, these entities were affiliates of petitioner, and for convenience we sometimes refer to petitioner as the purchaser of FIA's assets.

Petitioner paid $100,000 in consideration for the right of NFR (or its affiliates) to use the FIA name (or any similar name) for a period of 5 years, and $290,000 for a covenant not to compete by FIA and Commercial, also for a period of 5 years. Pursuant to an agreement separate from the March Agreement, petitioner made a $210,000 payment to Mr. Rafanello in consideration for his agreement not to compete for a period of 3 years.[47]

Moreover, petitioner was given the opportunity to employ some of FIA's marketing staff and equipment experts, many of whom had 15 or more years of experience in the medical equipment leasing industry. As of June 8, 1989, 23 of FIA's 65 employees became NLI employees. (Mr. Rafanello did not become an employee of NLI or any of its affiliates after the acquisition.)

Petitioner intended to fund the acquisition by issuing commercial paper. Funds so obtained were to be transferred by petitioner to NLI as intercompany debt and to Dial as a combination of debt and shareholder equity. Petitioner calculated that the lease revenues would provide a 15-percent rate of return on the amount petitioner provided to Dial as shareholders' equity, plus a profit from the cost of money it lent to NLI and Dial as intercompany debt. Petitioner expected the overall yield on the

---

[47] Any amortization deductions petitioner claimed with respect to the $100,000, the $290,000, and the $210,000 are not in dispute.

FIA leases to be 11.49 percent annually. The purchase price set forth in the March Agreement was subject to reduction in the event that the yield on the leases, computed as of February 28, 1989, was less than 11.49 percent.  The purchase price was to be reduced by the amount needed to produce an 11.49-percent yield.[48]  However, no purchase price adjustments were subsequently needed.

### D. Petitioner's 1989 Return

On its 1989 return, petitioner allocated $131,513,038 of the $141,456,620 it paid for FIA's assets to the lease portfolio.  None of the purchase price was allocated to goodwill.  The present dispute centers around the correctness of petitioner's allocation.

### E. Notice of Deficiency

Respondent determined that petitioner overstated the fair market value of (and thus its basis in) the lease portfolio by $1,328,618, which respondent determined should be allocated to goodwill, going-concern value, or other nonamortizable intangible assets.

---

[48]    The required yield of 11.49 percent meant that lease rents, plus book residual values, less nonrecourse debt payments, when discounted to present value of 11.49 percent, had to equal $39,788,569.  If the discounted present value using 11.49 percent was less than $39,788,569, the purchase price was to be reduced by the amount of the difference.

## Discussion

Preliminarily, we note that we are not bound by the representation made in the goodwill provision of the March Agreement, namely, that petitioner did not acquire any goodwill in its purchase of FIA's assets. It is well established that the substance of a transaction, rather than its form, governs the tax consequences. Garcia v. Commissioner, 80 T.C. 491, 498 (1983) (citing Commissioner v. Court Holding Co., 324 U.S. 331 (1945)); see also Gregory v. Helvering, 293 U.S. 465 (1935); Golsen v. Commissioner, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

### F. Residual Value

The parties agree that the residual value method under section 1060 is appropriate in this case. Under section 1060, consideration is allocated to four classes of assets in descending order of priority: Class I (e.g., cash and demand deposits); class II (e.g., certificates of deposit, Federal securities, readily marketable stock and securities, and foreign currency); class III (e.g., accounts receivable, equipment, buildings, land, and covenants not to compete); and class IV (goodwill and going-concern value). Sec. 1.1060-1T(a)(1), (b)(1), (d), Temporary Income Tax

Regs., 53 Fed. Reg. 27039-27040 (July 18, 1988).[49]  After being reduced by the amount of class I assets, consideration is allocated among assets in class II in proportion to the fair market values of such assets on the purchase date, then among class III assets in proportion to the fair market values of such assets on that date. Sec. 1.1060-1T(d)(2), Temporary Income Tax Regs., supra.  The amount of consideration so attributed to an asset in classes I through III may not exceed the fair market value of the asset on the purchase date. All remaining consideration, or residual consideration, must be allocated to class IV assets. See, e.g., East Ford, Inc. v. Commissioner, T.C. Memo. 1994-261.

Petitioner did not allocate any portion of the purchase price to class IV assets.  If we determine that petitioner overvalued the FIA lease portfolio on its 1989 tax return, then the difference between the fair market of the lease portfolio and the purchase price must be allocated to class IV assets.

Petitioner claims it neither acquired a trade or business when it purchased FIA's assets, nor paid a premium for FIA's assets, nor acquired goodwill.  Respondent, on the other hand, contends that

---

[49]    This temporary regulation was amended on Jan. 16, 1997. See 62 Fed. Reg. 2267 (Jan. 16, 1997).  Because the amended regulation is effective for asset acquisitions completed on or after Feb. 14, 1997, it is inapplicable herein.

petitioner acquired a trade or business,[50] paid a premium, and acquired goodwill. The parties presented expert witnesses to value the lease portfolio and thereby determine whether petitioner paid for any goodwill or going-concern value when it purchased FIA's assets.

### G. Expert Witnesses

As the trier of fact, we must weigh the evidence presented by the experts in light of their demonstrated qualifications in addition to all other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). However, we are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994).

Petitioner claims that the value of the lease portfolio is $134,383,364, while respondent contends that the value is

---

[50] Respondent points to the fact that in its Application to the Board of Governors of the Federal Reserve System, petitioner sought approval "to acquire substantially all of the assets and assume substantially all of the liabilities (to unrelated parties) of a going concern". (Emphasis added.)

$130,184,420. The $4,198,944 difference between the parties' valuations is explained by the different discount rates used by their experts (respondent's expert used a 15.6-percent discount rate, while petitioner's expert used an 11.5-percent discount rate).

### 1. Petitioner's Expert

Petitioner's expert, Peter S. Huck, of American Appraisal Associates, has an M.B.A. from Marquette University and is a senior member of the American Society of Appraisers. He wrote a direct report and testified regarding the fair market value of FIA's lease portfolio.[51] Using the discounted cash-flow method, he determined a $134,383,364 value for the FIA lease portfolio on June 12, 1989, by taking the sum of scheduled lease payments and book residual values, less third-party debt service payments, and then discounted the final amount to present value using an 11.5-percent rate.[52] To the result of that calculation, $45,460,848, Mr. Huck added the principal balance of the debt associated with the leases, for a

---

[51] At trial, Mr. Huck acknowledged that the transaction herein involved a lease portfolio but "included a business--aspects of a business."

[52] In selecting an 11.5-percent discount rate, Mr. Huck relied upon the following: (1) The Annual Percentage Rate (APR) on FIA lease transactions for the first and second half of 1989; (2) the relationship between the leases' APR and 5-year Government bonds; (3) the 11.49-percent yield specified in the March Agreement; and (4) the rates used in other lease transactions in the marketplace at the time of the transaction.

total value of $134,383,364.[53]  Mr. Huck testified that the 11.5-percent discount rate he determined was based on the "receivable yield amount" or "receivable yield".  In his view, the 11.5-percent discount rate is consistent with the 11.49-percent yield on the leases discussed in the March Agreement.

Mr. Huck based his analysis on financing for the net receivables with both debt and equity.  He concluded that, under the residual method, the purchase price ($141,456,620) was less than the sum of the fair market value of the lease receivables and the other tangible assets acquired ($144,343,582), and hence no portion of the purchase price should be allocated to goodwill or going-concern value.

## 2. Respondent's Expert

Respondent's expert, David N. Fuller, of Business Valuation Services, Inc., has an M.B.A. from Southern Methodist University. He is a chartered financial analyst and an accredited senior appraiser certified by the American Society of Appraisers. Mr. Fuller wrote a rebuttal report[54] and testified regarding the fair

---

[53]   Mr. Huck initially made a mathematical error of approximately $700,000 (with regard to cash inflow) but subsequently corrected the error.

[54]   Mr. Fuller only prepared a rebuttal report because he believed the information petitioner provided contained insufficient and questionable data to determine a precise value for the lease portfolio. Based on the record, we believe the
(continued...)

market value of the FIA lease portfolio.  He determined that the fair market value of FIA's lease portfolio, as of June 12, 1989, did not exceed $130,184,420[55] ($4,198,944 less than Mr. Huck's valuation).  Consequently, Mr. Fuller attributed $1,328,618 of the purchase price to goodwill.  Mr. Fuller arrived at the value for the lease portfolio through his "sensitivity" analysis by applying a 15.6-percent rate to discount the same cash-flow Mr. Huck used (lease payments plus book residual values less nonrecourse debt service payments). The 15.6-percent rate represented the cost of equity capital, which Mr. Fuller computed using the capital asset pricing model. This analysis was based on the assumption that, with regard to a hypothetical buyer, the portion of the lease portfolio not financed by nonrecourse debt would be financed entirely by equity.

Mr. Fuller opined that his 15.6-percent rate compares favorably with the 15-percent rate of return on equity that FIA

---

[54](...continued)
information provided to both experts may have been, to a certain extent, unreliable.

[55]     Mr. Fuller believed that the value of FIA's lease portfolio could be less than $130,184,420 but was unable to refine this belief due to lack of data (as discussed supra note 54). His value of $130,184,420 for the FIA lease portfolio, when added to the agreed value of $9,943,582 for FIA's other assets acquired by petitioner (the noncompete agreement with FIA and Commercial, the license to use the FIA name, and the other assets) totals $140,128,002, or $1,328,618 less than the purchase price.

generally exceeded (both before and after its acquisition by Federal) and the 15-percent rate of return on equity that petitioner projected its proposed acquisition of FIA would produce.

In sum, Mr. Fuller testified that Mr. Huck overvalued FIA's lease portfolio by approximately $4 to $5 million, which results in approximately $1.2 to $2.2 million in intangible assets.

### 3. Critique of Experts

Not unexpectedly, each expert criticized his colleague's analysis. The following points highlight these disparate perspectives.

Mr. Fuller opined that Mr. Huck simply used the portfolio's expected yield (the rate at which petitioner expected the portfolio to earn income) as the appropriate discount rate. Use of the portfolio's expected yield, he insisted, assumes that no other assets are necessary to realize that yield and treats the portfolio as the equivalent of a fixed-income instrument. According to Mr. Fuller, Mr. Huck ignored the fact that petitioner purchased a going concern; the purchase included the FIA portfolio in addition to other FIA assets, and the right to hire FIA's expert personnel (who originated the equipment leases and turned the residual value into profits). The presence of these other business assets, in Mr. Fuller's opinion, was necessary to produce income at the yield rate. Mr. Fuller contended that the 11.49-percent yield required

by the March Agreement, while providing a mechanism for a downward adjustment to the purchase price, was not indicative of the appropriate discount rate.

Mr. Huck countered these arguments by reiterating that he did not simply rely on the expected yield rate but used several factors (enumerated supra note 52) to reach his conclusion. These factors, he believed, clearly indicate that an 11.5-percent discount rate represents the current market rate for comparable assets.

Mr. Fuller also believed that instead of using a cash inflow analysis, Mr. Huck should have used a cash-flow analysis (referring to the net cash-flow generated after considering all expenses and necessary adjustments). And, according to Mr. Fuller, Mr. Huck erred by not using the capital asset pricing model to determine the appropriate discount rate to be applied to cash-flow attributable to invested capital.[56] Finally, Mr. Fuller criticized Mr. Huck for failing to include capital charges in his analysis.[57]

---

[56] Mr. Huck testified that he did not use the capital asset pricing model because he considered it inappropriate herein.

[57] Mr. Fuller testified that the premise of a capital charge is that other assets besides the asset being valued (such as the lease portfolio herein) are necessary to produce the business cash-flow. Capital charges take into account the presence of these other assets by assigning a portion of the cash-flow to them, leaving only the cash-flow attributable to the asset being valued. Mr. Fuller did not take this approach in his report (which would have had the effect of reducing the value of

(continued...)

Mr. Huck criticized Mr. Fuller's rebuttal report, claiming: (1) Rather than doing an independent valuation, Mr. Fuller merely used Mr. Huck's analysis and applied an incorrect discount rate (equity rate of return) to those numbers; (2) Mr. Fuller did not consider recourse debt in determining cash-flow, but rather assumed that any portion of the purchase price not funded with nonrecourse debt would be funded with equity; and (3) a typical buyer of the lease portfolio would finance its acquisition with a combination of nonrecourse debt, recourse debt, and equity. While Mr. Huck discounted "gross" cash-flows (net only of nonrecourse debt) based on the market rate for such assets (which reflected the required blended cost of capital), Mr. Fuller discounted the same cash-flows using an equity rate. These cash-flows did not consider recourse debt service, operating expenses, and taxes. Because Mr. Fuller did not apply his equity rate against equity cash-flows, Mr. Huck believes that Mr. Fuller's analysis is seriously flawed. Simply put, Mr. Huck claims that Mr. Fuller used an equity rate for purposes of discounting the lease portfolio's cash-flows, whereas those cash-flows included a return on debt. In Mr. Huck's view, Mr. Fuller should have based his discount rate on the market receivable yield which accounts for the expected debt leveraging.

---

[57](...continued)
the portfolio below $130,184,420) because he did not believe he had sufficient information to do so.

Mr. Fuller acknowledged at trial that normally a purchaser would not finance the acquisition of a lease portfolio with 100 percent equity. He admitted that if a mixture of debt and equity were used, he would be forced to lower the 15.6-percent discount rate he had determined. However, Mr. Fuller believed that the net cash-flow from FIA's lease portfolio is, for the most part, an equity cash-flow to the holder of the net equity investment in the portfolio, which requires an equity rate of return to properly discount it to present value.

Finally, petitioner criticized Mr. Fuller's use of the 25-percent premium Commercial paid in 1986 as another basis for determining the value of FIA's intangible assets in 1989. Petitioner first complains that Mr. Fuller ignored industry practice, which is intended to reflect the negotiated value of intangible assets as an amount over and above net asset value. And second, petitioner maintains, circumstances were different in 1986 and 1989 because when Commercial purchased FIA in 1986, it acquired the services of Mr. Rafanello, FIA's most important employee, whereas petitioner did not acquire Mr. Rafanello's services in 1989.

H. Conclusion

We have considered the qualifications and experience of the parties' experts, as well as the substance and reasoning of their reports. The difference in their respective valuations of FIA's

leasehold portfolio is explained by the different discount rates they used (15.6 percent by respondent's expert, Mr. Fuller; 11.5 percent by petitioner's expert, Mr. Huck). As discussed above, both expert reports are susceptible to criticism. While we find Mr. Huck's analysis generally sound, Mr. Fuller established that Mr. Huck's 11.5-percent discount rate should be adjusted upward. Both experts admitted at trial the inexactitude of their methodologies: Mr. Huck conceded that, in light of the imprecise nature of valuing assets, the appropriate discount rate herein could be anywhere from 11.5 to 13 percent; and Mr. Fuller conceded that his 15.6-percent discount rate could be reduced somewhat to properly reflect debt and equity financing. Thus, in consideration of all the evidence presented, and in light of both experts' forthright flexibility, we adopt 13 percent as the appropriate discount rate herein.[58]

Because other issues remain to be resolved in these consolidated cases,

<u>Appropriate orders</u>

<u>will be issued</u>.

---

[58] We expect the parties' Rule 155 computations to utilize the 13-percent discount rate to determine the exact value of the lease portfolio and any remaining value to be attributed to goodwill or going-concern value. We expect the parties to correct, in their Rule 155 computations, any overstatement of cash inflows and mathematical errors Mr. Huck made.